UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- versus -

YSIDRO DIAZ,

Defendant.

MEMORANDUM EXPLAINING
A POLICY DISAGREEMENT
WITH THE DRUG
TRAFFICKING OFFENSE
GUIDELINE

11-CR-00821-2 (JG)

JOHN GLEESON, United States District Judge:

## INTRODUCTION

Last year in *United States v. Dossie*, I wrote about how the mandatory minimum sentences in drug trafficking cases distort the sentencing process and mandate unjust sentences.[1] This case illustrates a separate but related defect in our federal sentencing regime.

Ysidro Diaz was a run-of-the-mill, low-level participant in a drug distribution offense. He was the middleman between the seller on one side and the buyer (who was secretly working for the government) on the other. Diaz facilitated a deal for a kilogram of heroin. He was paid for his services, but had no proprietary interest in the drugs that were the subject of his crime.

Because Diaz's crime involved a kilogram of heroin, he was charged with the ten-year mandatory minimum discussed at length in *Dossie*, even though the government agrees he did not occupy the leadership role for which Congress specifically devised that harsh penalty.

---

[1]     851 F. Supp. 2d 478 (E.D.N.Y. 2012).

The good news for Diaz is that he dodged the mandatory minimum by satisfying all five requirements for so-called "safety valve" relief.

The bad news for Diaz is the point of this memorandum: He got out of the mandatory minimum frying pan, but all that got him was into the Guidelines fire.

Diaz will be sentenced in a few weeks, and when that happens I will carefully consider all the factors set forth in 18 U.S.C. § 3553(a) except one – the length of imprisonment recommended by the United States Sentencing Commission's Guidelines Manual.[2] Though I will not ignore Diaz's Guidelines range, I will place almost no weight on it because of my fundamental policy disagreement with the offense guideline that produces it. In fairness to the government, I write here to explain my belief that the offense guideline for heroin, cocaine, and crack offenses ("drug trafficking offenses") is deeply and structurally flawed.[3] As a result, it produces ranges that are excessively severe across a broad range of cases, including this one.

The flaw is simply stated: the Guidelines ranges for drug trafficking offenses are not based on empirical data, Commission expertise, or the actual culpability of defendants. If they were, they would be much less severe, and judges would respect them more. Instead, they are driven by drug type and quantity, which are poor proxies for culpability.

The genesis of the structural flaw is easily traced. It is rooted directly in the fateful choice by the original Commission to link the Guidelines ranges for *all* drug trafficking defendants to the onerous mandatory minimum penalties in the Anti-Drug Abuse Act of 1986 ("ADAA") that were expressly intended for only a few.

---

[2]      I refer to the United States Sentencing Commission as the "Commission" and the Federal Sentencing Guidelines as the "Guidelines" throughout this memorandum.

[3]      There are other drug types, of course, and I do not mean to suggest that the reasoning set forth here is inapplicable to the sentencing ranges recommended by the guideline for those drug types. However, I do not see those drug types in sufficient numbers to render an opinion with respect to them.

As discussed below,

--       District Judges are authorized to disagree on policy grounds with the Guidelines;

--       I disagree on policy grounds with the Guidelines ranges for drug trafficking offenses because they are not based on empirical data and national experience;

--       Those ranges are excessively severe because they subject all drug trafficking defendants to the harsh weight-driven regime the ADAA intended only for managers and leaders of drug organizations;

--       Those ranges are not now and have never been "heartland" sentences;

--       The drug trafficking offense guideline has been a major contributor to the dramatic increase in the federal prison population;

--       The Commission should "de-link" the drug trafficking Guidelines ranges from the ADAA's weight-driven mandatory minimum sentences and use its resources, knowledge, and expertise to fashion fair sentencing ranges for drug trafficking offenses.  In the meantime, it should reduce those ranges by a third;

--       The Commission should make the drug trafficking offense guideline more sensitive to factors directly relevant to culpability, including the defendant's role in the offense, and less sensitive to drug type and quantity;

--       The Commission's stated reasons for refusing to de-link the drug trafficking Guidelines ranges from the mandatory minimum sentences are wrong;

--       The Commission should welcome (rather than seek to stifle as it currently does) policy disagreements expressed by sentencing judges;

--       The federal judiciary has repeatedly told the Commission that the drug trafficking Guidelines ranges should be de-linked from the mandatory minimum sentences, and the Commission should stop ignoring that message;

--       Whatever else it does or fails to do, the Commission should at least desist from its current practice of freighting the debate over adherence to the Guidelines with suggestions of racial disparity.

A.       *Ysidro Diaz and His Offense of Conviction*

Ysidro Diaz is 37 years old.  He is from the Dominican Republic.  In September 2011 he agreed to sell heroin to a confidential informant.  On October 28, 2011 Diaz reiterated his agreement, and later that day he arranged for a third person to deliver the heroin.  That third

person in fact delivered "sham," that is, a substance that looked like heroin but was not. But Diaz was unaware of that fact and, without objection from either side, the presentence report holds Diaz accountable for conspiring to deliver one kilogram of heroin.

The Guidelines instruct that a defendant convicted of a drug trafficking offense involving at least one kilogram but less than three kilograms of heroin receive a base offense level of 32, which corresponds to a sentencing range of 121-51 months (10 to 12 ½ years).[4] The applicable statutory minimum sentence for an offense involving this quantity of heroin is ten years.[5] Diaz, however, is eligible for "safety valve" relief from the applicability of the statutory minimum sentence.[6] His eligibility for safety valve relief also renders him eligible for a corresponding safety valve adjustment under the Guidelines, resulting in an adjusted offense level of 30, which corresponds to a sentencing range of 97-121 months (8 to 10 years).[7] Diaz

---

[4] U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(a)(5) & (c) (2012). There was also some cocaine (215.55 grams) involved in Diaz's offense, but it does not increase his base offense level. Under the Guidelines, where an offense involves two types of narcotics, the narcotics are to be converted to their marihuana equivalent and then combined to achieve a single offense level. *Id.* § 2D1.1 cmt. nn. 7-8. According to the Drug Equivalency Tables, 1 kilogram of heroin is equivalent to 1,000 kilograms of marihuana and 1 gram of cocaine is equivalent to 200 grams of marihuana. 215.55 grams of cocaine is therefore equivalent to 43,110 grams or 43.11 kilograms of marihuana. Accordingly, the combined marihuana equivalent of the heroin and cocaine involved in Diaz's offense is 1,043.11 kilograms. The Guidelines instruct that a defendant convicted of a drug trafficking offense involving at least 1,000 kilograms but less than 3,000 kilograms of marihuana receive a base offense level of 32. *Id.* § 2D1.1(a)(5) & (c). Thus, Diaz's range is the same with or without the cocaine.

[5] 21 U.S.C. § 841(b)(1)(A)(i).

[6] 18 U.S.C. § 3553(f). The safety valve directs district courts to disregard the mandatory minimum and impose a sentence pursuant to the Guidelines where the following criteria are satisfied: (1) the defendant has no more than one criminal history point; (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in the offense; (3) no death or serious bodily injury resulted from the offense; (4) no aggravating role adjustment applies; and (5) the defendant truthfully provided to the Government all information and evidence he has concerning the offense and related additional offenses.

[7] U.S. SENTENCING GUIDELINES MANUAL §§ 2D1.1(b)(16), 5C1.2(a) (2012). The adjustment decreases the base offense level of qualifying defendants by two levels.

has no prior criminal convictions, placing him in Criminal History Category I.  No other

adjustments apply.[8]

B.      *My Policy Disagreement with the Guidelines Ranges for Drug Trafficking Offenses*

  1.    *Sentencing Judges Have Authority to Act on Policy Disagreements with the Guidelines*

Sentencing judges may impose sentences that vary from the applicable Guidelines

ranges based on their disagreement with a particular policy reflected in the Guidelines.[9]  The

Supreme Court first recognized this authority in *Kimbrough v. United States*, which addressed

the shameful disparity between the Guidelines' treatment of crack and powder cocaine

offenses.[10]  Since then, the courts of appeals have recognized that policy disagreements with

---

[8]        Diaz timely notified the Government of his intention to enter a plea of guilty, which will render him eligible for an additional 3-level downward adjustment for acceptance of responsibility.  U.S. SENTENCING GUIDELINES MANUAL § 3E1.1 (2012).  This adjustment will likely result at sentencing in a total offense level of 27, which corresponds to a sentencing range of 70-87 months (5 ⅚ to 7 ¼ years).  This memorandum discusses the fairness of sentences in drug trafficking cases and, therefore, focuses on the sentencing ranges produced by the drug trafficking offense guideline prior to the application of an adjustment for acceptance of responsibility.  Defendants should be subject to fair sentencing ranges regardless of whether or not they plead guilty in a timely manner; in other words, a timely guilty plea should afford them an additional break from an otherwise fair sentence.

[9]        *See Spears v. United States*, 555 U.S. 261, 263-67 (2009); *United States v. Kimbrough*, 552 U.S. 85, 109–10 (2007); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010); *see also United States v. VandeBrake*, 679 F.3d 1030, 1037 (8th Cir. 2012); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (en banc); *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008).  The few decisions to the contrary have been vacated or overruled after the government confessed error.  *See Vazquez v. United States*, 130 S. Ct. 1135 (2010) (vacating Eleventh Circuit decision holding that district court could not depart from the career offender guideline based on a policy disagreement); *Corner*, 598 F.3d 411 (overruling Seventh Circuit decisions holding the same); *see also United States v. Merced*, 603 F.3d 203, 218 (3d Cir. 2010) (observing that the "government concedes that a sentencing court may vary downward from the Guidelines range generated by the career offender provision based solely on a policy disagreement with the scope of that provision").

[10]       552 U.S. at 110 ("[T]he Commission itself has reported that the crack/powder disparity produces disproportionately harsh sanctions, *i.e.*, sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of sentencing set forth in §3553(a).  Given all this, it would not be an abuse of discretion for a district court to conclude when sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than necessary' to achieve §3553(a)'s purposes, even in a mine-run case." (citation and internal quotation marks omitted)); *Spears*, 555 U.S. at 263-67.  The disparity between crack and powder cocaine offenses has since been reduced, but not eliminated.  *See* Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2(a), 124 Stat. 2372 (codified

other offense guidelines are legitimate grounds for a variance.[11]  It is now settled law that

"district judges are at liberty to reject *any* Guideline on policy grounds – though they must act

reasonably when using that power."[12]

A district court's authority to vary from the applicable Guidelines range due to a

policy disagreement is at its greatest when the offense Guideline at issue is not the product of the

Commission's empirical analysis and technical expertise.  Congress established the Commission

pursuant to the Sentencing Reform Act of 1984 ("SRA") "to formulate and constantly refine

national sentencing standards."[13]  In fulfilling this "important institutional role," the Commission

draws on a "capacity courts lack to base its determinations on empirical data and national

experience, guided by professional staff with appropriate expertise."[14]  When an offense

guideline is based on the Commission's analysis of empirical data and national experience, the

advisory ranges it produces can fairly be said to "reflect a rough approximation of sentences that

---

as amended in scattered sections of 21 U.S.C.); U.S. SENTENCING GUIDELINES MANUAL app. C, Vol. III, amend. 748, 750 (2012).

[11]        *See, e.g., Dorvee*, 616 F.3d at 188 (child pornography); *Corner*, 598 F.3d at 416 (career offender); *Cavera*, 550 F.3d at 194–96 (firearms); *United States v. Rodriguez*, 527 F.3d 221, 229 (1st Cir. 2008) ("fast-track" departure).

[12]        *Corner*, 598 F.3d at 415 (emphasis added); *see also Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011) ("[O]ur post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-Guidelines sentence based on a disagreement with the Commission's views."); *United States v. Mitchell*, 624 F.3d 1023, 1030 (9th Cir. 2010) ("[S]entencing judges can reject any Sentencing Guideline, provided that the sentence imposed is reasonable."), *cert. denied*, 131 S. Ct. 1542 (2011); *United States v. Stone*, 575 F.3d 83, 89 (1st Cir. 2009) (*Kimbrough* authorizes sentencing courts to vary a sentence due to a policy disagreement with the Guidelines "even where a guideline provision is a direct reflection of a congressional directive."); *United States v. Mondragon-Santiago*, 564 F.3d 357, 367 (5th Cir. 2009) ("In appropriate cases, district courts certainly may disagree with the Guidelines for policy reasons and may adjust a sentence accordingly."); *United States v. Carr*, 557 F.3d 93, 106 (2d Cir. 2009) ("*Kimbrough* stands for the proposition that the sentencing court has discretion to deviate from the Guidelines-recommended range based on the court's disagreement with the policy judgments evinced in a particular guideline."

[13]        *Kimbrough*, 552 U.S. at 108.

[14]        *Id*. at 109 (citation and internal quotation marks omitted).

might achieve [the sentencing] objectives" of the SRA.[15]  In that event, the Supreme Court has suggested that "closer review" of sentences outside the applicable range might be warranted.[16] But no such scrutiny is warranted where a variance is based on a policy disagreement with offense guidelines that are "not based on empirical data and national experience, and hence 'do not exemplify the Commission's exercise of its characteristic institutional role.'"[17]  In such cases, appellate courts should defer to a sentencing judge's reasonable policy disagreement with the Guidelines.[18]

> 2.  *The Guidelines Ranges for Drug Trafficking Offenses Are Not Based on Empirical Data and National Experience*
>
> > a.  *The Analysis of Pre-Guidelines Sentencing Data by the Original Commission*

The Sentencing Reform Act instructed the Commission to establish Guidelines that would reconcile the multiple purposes of punishment[19] while promoting the goals of uniformity[20] and proportionality.[21]  As a "starting point," the SRA directed the Commission to

---

[15]      *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)) (internal quotation marks omitted). The basic sentencing objectives of the SRA are set forth in 18 U.S.C. § 3553(a), which enumerates the factors a sentencing judge must consider when imposing punishment.  The SRA further directs the Commission to establish Guidelines that carry out these same objectives.  28 U.S.C. § 991(b)(1)(A).

[16]      *Kimbrough*, 552 U.S. at 109; *see also Cavera*, 550 F.3d at 192.

[17]      *Cavera*, 550 F.3d at 192 (quoting *Kimbrough*, 552 U.S. at 109).

[18]      *See, e.g.*, *VandeBrake*, 679 F.3d at 1037-40.

[19]      28 U.S.C. § 991(b)(1)(A).  The multiple purposes of punishment are reflected in 18 U.S.C. § 3553(a), which sets forth the basic sentencing objectives of the SRA.  Those purposes include just punishment, deterrence, incapacitation, and rehabilitation.  18 U.S.C. § 3553(a); *see also* U.S. Sentencing Guidelines Manual § 1A.1.2 (2012).

[20]      28 U.S.C. § 991(b)(1)(B) (instructing the Commission to "avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct"); U.S. Sentencing Guidelines Manual § 1A.1.3 (2012) ("Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.").

[21]      28 U.S.C. § 991(b)(1)(B) (instructing the Commission to "maintain[] sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices"); U.S. Sentencing Guidelines Manual § 1A.1.3 (2012) ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity.").

"ascertain the average sentences imposed" in pre-Guidelines cases for particular categories of offenses.[22]  Congress did not require the new Guidelines to mirror that data; indeed, the SRA explicitly provided that "[t]he Commission shall not be bound by such average sentences, and shall independently develop a sentencing range that is consistent with the purposes of sentencing described in section 3553(a)(2) of Title 18, United States Code."[23]  Moreover, the SRA directed the Commission to "insure that the guidelines reflect the fact that, in many cases, current sentences do not accurately reflect the seriousness of the offense."[24]  But in performing its initial task of formulating the Guidelines, the Commission's first job, logically, was to calculate average pre-Guidelines sentences.

The original Commissioners struggled without success to create a governing philosophy for the new Guidelines.  The Introduction to the first Guidelines Manual notes that the Commissioners confronted the "philosophical problem" of "reconcil[ing] the differing perceptions of the purposes of criminal punishment."[25]  In particular, the Introduction discussed the tension between a "just deserts" approach, where punishment is "scaled to the offender's culpability and the resulting harms," and a deterrence approach, where defendants "receive the punishment that most effectively lessens the likelihood of future crime."[26]  The Commissioners concluded that "[a] clear-cut Commission decision in favor of one of these approaches would diminish the chance that the guidelines would find the widespread acceptance for effective implementation."[27]  The Commission admitted to a similar "tension" with respect to the goals of

---

[22]    28 U.S.C. § 994(m).

[23]    *Id.*

[24]    *Id.*

[25]    U.S. SENTENCING GUIDELINES MANUAL § 1A.1.3 (1987).

[26]    *Id.*

[27]    *Id.*  Both the "just deserts" and deterrence approaches also suffered from methodological problems.  Proponents of a "just deserts" approach could not achieve a consensus "about the correct rank order of the seriousness of different crimes."  Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises*

uniformity and proportionality, which "like the historical tension between law and equity, makes it difficult to achieve both . . . simultaneously."[28]

     As Justice Stephen Breyer, who was one of the original Commissioners, explained, the inability to reach an agreement on a governing philosophy for the Guidelines produced an "important compromise."[29] The Commission "decided to base the Guidelines primarily upon typical, or average, actual past practice" by analyzing "10,500 actual past cases in detail . . . along with almost 100,000 other less detailed case histories."[30] The Introduction to the first Guidelines Manual also claimed a strong empirical basis for the sentencing ranges set forth in the Guidelines: "In its initial set of guidelines, the Commission sought to solve both the practical and philosophical problems of developing a coherent sentencing system by taking an empirical approach that used as a starting point data estimating pre-guidelines sentencing practice."[31]

---

*upon Which They Rest*, 17 HOFSTRA L. REV. 1, 15 (1988). Advocates of a deterrence model lacked the requisite empirical support for "linking detailed and small variations in punishment to prevention of crime." *Id*. at 17.

    [28] U.S. SENTENCING GUIDELINES MANUAL § 1A.1.3 (1987); *see also Rita*, 551 U.S. at 349 ("The Guidelines commentary . . . says, for example, that the goals of *uniformity* and *proportionality* often conflict. The commentary describes the difficulties involved in developing a practical sentencing system that sensibly reconciles the two ends." (emphasis in original)).

    [29] Breyer, *supra* note 27, at 17.

    [30] *Id*. at 17-18. For a detailed description of the Commission's analysis of pre-Guidelines data, see U.S. SENTENCING COMM'N, SUPPLEMENTARY REPORT ON THE INITIAL SENTENCING GUIDELINES AND POLICY STATEMENTS 21-26 (1987) [hereinafter SUPPLEMENTARY REPORT].

    [31] U.S. SENTENCING GUIDELINES MANUAL § 1A.1.3 (1987); *see also* Brief for the United States Sentencing Commission as Amicus Curiae in Support of Respondent at 7, *Claiborne v. United States*, 552 U.S. 38 (2007) (No. 06-5618), *Rita v. United States*, 551 U.S. 338 (2007) (No. 06-5754) ("As it began to draft the Guidelines, the Commission chose to tap the collective expertise of federal judges. . . . By drawing averages from thousands of past sentencing decisions and examining data in tens of thousands of cases, the Commission was able to reduce disparity (the very definition of averaging), while striking a reasonable balance between the purposes of punishment. That analysis allowed the Commission to discern what offense and offender characteristics tended to affect the sentencing decision, and to what extent." (citations and internal quotation marks omitted)).

In fact, as discussed below, empirical data on drug trafficking offenses were gathered, but they had *no* role in the formulation of the Guidelines ranges for drug trafficking offenses.

      b.   *The Anti-Drug Abuse Act of 1986 – Congress's Curveball to the Original Commission*[32]

The Commission was created in 1984, and its mission was to promulgate Guidelines that would become effective on November 1, 1987.[33] On June 19, 1986, University of Maryland basketball star Len Bias died of a drug overdose. Congress promptly enacted the Anti-Drug Abuse Act of 1986 ("ADAA"), which established a two-tiered scheme of mandatory minimum and enhanced maximum sentences that have now become central features of the federal drug sentencing landscape. The ADAA's five-year mandatory minimum, with a maximum enlarged from 20 to 40 years, was specifically intended for the managers of drug enterprises, while the ten-year mandatory minimum, with a maximum of life, was intended for the organizers and leaders.[34]

---

[32]     This discussion borrows from *Dossie*, 851 F. Supp. 2d 478.

[33]     18 U.S.C. § 3551 (1987); U.S. SENTENCING GUIDELINES MANUAL § 1A.1.2 (1987) ("The law requires the Commission to send its initial guidelines to Congress by April 13, 1987, and under the present statute they take effect automatically on November 1, 1987." (citing 18 U.S.C. § 3551)).

[34]     The Commission's 2011 report to Congress on mandatory minimum sentencing provisions in federal law provided the following useful summary of that evidence:

    Floor statements delivered by members in support of the 1986 Act and a committee report on a predecessor bill suggest that Congress intended to create a two-tiered penalty structure for discrete categories of drug traffickers. Specifically, Congress intended to link the five-year mandatory minimum penalties to what some called "serious" traffickers and the ten-year mandatory minimum penalties to "major traffickers." . . .

    Senator Robert Byrd, then the Senate Minority Leader, summarized the intent behind the legislation:

        For the kingpins – the masterminds who are really running these operations . . . we require a jail term upon conviction. If it is their first conviction, the minimum term is ten years. . . . Our proposal would also provide mandatory minimum penalties for the middle-level dealers as well. Those criminals would also have to serve time in jail. The minimum sentences would be slightly less than those for the kingpins, but they nevertheless would have to go to jail – a minimum of 5 years for the first offense.

But right from the start Congress made a mistake. The severe sentences it mandated to punish specified *roles* in drug trafficking offenses were triggered not by role but by drug type and quantity instead.[35] Instead of prescribing a five-year mandatory minimum for a defendant who the government proves to be a manager of a drug enterprise, the ADAA provides that the mandatory minimum is triggered by offenses involving 100 grams of heroin, 500 grams of cocaine, or 28 grams of crack.[36] And instead of hinging the ten-year mandatory minimum on the government's proof of a defendant's leadership or "kingpin" status, Congress simply used larger drug quantities: 1 kilogram of heroin, 5 kilograms of cocaine, or 280 grams of crack.[37] So if an offense happens to involve a drug type and quantity that triggers a mandatory minimum, *every* defendant involved in that crime, whatever his or her actual role, can be treated as a manager or leader at the option of the United States Attorney.[38]

---

A report issued by the House Judiciary Subcommittee on Crime following its consideration of a predecessor bill also provides evidence of Congress's intent to establish two-tiered mandatory minimum penalties for serious and major traffickers. The Subcommittee determined that the five and ten-year mandatory minimum sentencing structure would encourage the Department of Justice to direct its "most intense focus" on "major traffickers" and "serious traffickers." "One of the major goals of this bill is to give greater direction to the DEA and the U.S. Attorneys on how to focus scarce law enforcement resources."

U.S. SENTENCING COMM'N, REPORT TO THE CONGRESS: MANDATORY MINIMUM PENALTIES IN THE FEDERAL CRIMINAL JUSTICE SYSTEM 24 (2011) [hereinafter MANDATORY MINIMUM REPORT] (quoting 132 CONG. REC. 27, 193-94 (Sept. 30, 1986); H.R. REP. NO. 99-845, pt. 1, at 11-12 (1986)).

[35] Senator Robert Byrd's summary of the legislative intent of the ADAA explicitly linked drug type and quantity to role, describing "kingpins" as "identifi[able] by the amount of drugs with which they are involved." *Id*. (quoting 132 CONG. REC. 27, 193-94 (Sept. 30, 1986)).

[36] 21 U.S.C. § 841(b)(1)(B).

[37] *Id*. § 841(b)(1)(A). The quantities for crack reflect the current thresholds. Before the Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2(a), 124 Stat. 2372 (codified as amended in scattered sections of 21 U.S.C.), was enacted, an offense involving only five grams of crack triggered the five-year mandatory minimum and an offense involving 50 grams of crack triggered the ten-year mandatory minimum.

[38] A defendant is subject to the mandatory minimum only if the charging instrument puts him on formal notice of it by alleging the requisite type and quantity of drug and citing the relevant penalty provision. *E.g.*, *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012); *United States v. Gonzalez*, 420 F.3d 111, 115, 130-31 (2d Cir. 2005); *United States v. Thomas*, 274 F.3d 655, 663 (2d Cir. 2001). Thus, whether a defendant faces a mandatory minimum at all is a matter left to prosecutorial discretion. At any time during a prosecution, the government can withdraw its invocation of the mandatory minimum provision, allowing the court to sentence the

c. *The Influence of the ADAA's Mandatory Minimum Provisions on the Guidelines Ranges for Drug Trafficking Offenses*

The ADAA's mandatory minimum sentences created a problem for the original Commission. Those sentences were far more severe than the average sentences previously meted out to drug trafficking offenders; indeed, that was the point of the ADAA. Take, for example, the Commission's own analysis of pre-Guidelines averages for drug trafficking offenses involving quantities that would trigger the ten-year mandatory minimum. According to that analysis, an offense involving over one kilogram to three kilograms of heroin would result in a sentencing range of 51 to 63 months (4 ¼ to 5 ¼ years) and an offense involving 5 to 6 kilograms of cocaine would result in a range of 46-57 months (3 ⅘ to 4 ¾ years), whereas the ADAA's mandatory minimum provisions would require the judge to impose at least ten years in prison in either circumstance.[39] The problem for the Commission was that it might not look

---

defendant without being bound by it. In *Dossie*, I respectfully asked the Department of Justice to alter its charging policies by (1) citing to the ten-year mandatory minimum only when the government intends to prove that the defendant occupied a leadership role; (2) citing to the five-year mandatory minimum only when the government intends to prove a managerial role; and (3) withdrawing the mandatory minimum provision (or reducing it, as the case may be) if the corresponding aggravated role has not been proven by the government or admitted by the defendant. 851 F. Supp. 2d at 479.

The request has garnered some support. *See* Adam Liptak, *A Tough Judge's Proposal for Fairer Sentencing*, N.Y. TIMES, May 29, 2012, at A17 ("Paul G. Cassell, a former federal judge . . . said Judge Gleeson's proposal . . . was . . . administrable, fair, and 'doable in this political environment' because it requires no action from Congress.'"); Jim Walden, Op-Ed, *Mandatory Minimums for Kingpins Only*, NAT'L L. J. (May 7, 2012), http://www.law.com/jsp/nlj/PubArticleNLJ.jsp?id=1202551920075&Mandatory_minimums_for_kingpins_only ("In a recent case, *U.S. v. Dossie*, Gleeson called on U.S. Attorney General Eric Holder Jr. to reform DOJ's inconsistent and irrational use of mandatory-minimum sentences in drug cases, reserving them for drug kingpins, as Congress intended."). There has been no response from the Department of Justice.

[39]    I calculated these ranges by consulting the Commission's pre-Guidelines base offense level averages, *see* SUPPLEMENTARY REPORT, *supra* note 30, at 34 tbl. 1(a), and then using the Sentencing Table in the 1987 Guidelines Manual to determine the sentencing range corresponding to each base offense level. U.S. SENTENCING GUIDELINES MANUAL ch. 5, pt. A (1987). These ranges assume that the defendant has no criminal history and that no other adjustments apply. The ADAA established, for the first time, penalties differentiating between powder and crack cocaine. Therefore, the Commission's analysis of pre-Guidelines averages for drug trafficking offenses has no separate category for crack offenses.

right for a defendant to have a Guidelines range significantly lower than the minimum sentences mandated by Congress in the ADAA.

The Commission had several options for addressing this problem. It could have used the available data to establish Guidelines without regard to the mandatory minimum provisions, and stipulated that whenever a mandatory minimum exceeds the applicable range, the statutory sentence controls.[40] State sentencing commissions confronted with mandatory minimum statutes have largely adopted this approach, which has the advantage of "mak[ing] clear when sentences uniquely result from application of mandatory penalty statutes."[41] Another alternative was to assimilate the ADAA's mandatory minimum provisions into the Guidelines by using the Commission's own role-in-the-offense adjustments to trigger sentences commensurate with an applicable mandatory minimum. Under the Guidelines, leaders and organizers of large-scale criminal operations receive a four-level upward adjustment; managers and supervisors receive a two-level upward adjustment.[42] Those were the respective roles Congress had in mind when it included the five and ten-year mandatory minimum provisions in the ADAA. The original Commission might have used the pre-Guidelines averages for drug trafficking offenses but further provided that the Guidelines ranges for defendants who receive upward role adjustments cannot be less than five years if the defendant is a manager or supervisor or less than ten if he is an organizer or leader, provided the offense involves the drug type and quantity needed to trigger the relevant mandatory minimum.

The Commission made neither of these choices. Instead, it made one of the most important decisions in its history: It jettisoned its data entirely and made the quantity-based sentences in the ADAA proportionately applicable to *every* drug trafficking offense. In other

---

[40]     MICHAEL TONRY, SENTENCING MATTERS 79, 96–98 (1996).
[41]     *Id*.
[42]     U.S. SENTENCING GUIDELINES MANUAL § 3B1.1 (2012).

words, the Guidelines incorporated the mandatory minimum provisions of the ADAA – driven by drug type and quantity – into its sentencing grid and then provided a graduated scale of punishment for greater and lesser weights of heroin, cocaine, and crack.[43]  Thus, for example, offenses involving 100 or more grams of heroin, which qualify for a five-year mandatory minimum, are assigned a base offense level of 26, which corresponds to a Guidelines range of 63-78 months (5 ¼ to 6 ½ years).[44]  Likewise, offenses involving one kilogram or more of heroin, which qualify for a ten-year mandatory minimum, are assigned a base offense level of 32, which corresponds to a Guidelines range of 121-51 months (10 to 12 ½ years).[45]  Base offense levels for lesser and greater quantities of heroin slope downwards and upwards accordingly.[46]

The original Commission was far from forthright about the role of its own data in formulating Guidelines ranges for drug trafficking offenses.  The Introduction to the first Guidelines Manual contained the opaque understatement that the ADAA "suggest[ed] or require[d] departure" from that data by "impos[ing] increased and mandatory minimum sentences."[47]  But the Commission otherwise failed to discuss or explain this momentous decision.[48]  A later Commission – or at least the staff of a later Commission – lamented this

---

[43]     Tonry uses an elegant metaphor to describe this approach: "Imagine a sentencing guidelines grid as a lattice.  Under the mandatories-as-trumps approach, long minimum sentences poke through the lattice and when they are very long, tower above it.  Under the commission's approach, the entire lattice is lifted, as if the mandatory minimums were posts, and the sentences for many crimes not covered by the mandatory provisions are lifted also."  TONRY, *supra* note 40, at 97.

[44]     U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(a)(5) & (c), ch. 5, pt. A (2012).

[45]     *Id.*

[46]     *See* U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 49 (2004) [hereinafter FIFTEEN YEAR REPORT] ("In addition to linking the drug amounts in the statutes to guideline ranges at the five-and ten-year levels, the Drug Quantity Table extends the quantity-based approach across 17 different levels falling below, between, and above the two amounts specified in the [ADAA].").

[47]     U.S. SENTENCING GUIDELINES MANUAL § 1A.1.2 (1987).

[48]     FIFTEEN YEAR REPORT, *supra* note 46, at 49 ("The *Guidelines Manual*, *Supplementary Report* and other documents published at the time of guideline promulgation do not discuss why the Commission extended the ADAA's quantity-based approach in this way.").

absence of forthrightness. In 2004 the Commission's fifteen-year report to Congress had these words for the original Commission's failure to discuss why it extended the "quantity-based" approach of the ADAA across the entire spectrum of drug trafficking sentences:

> This is unfortunate for historians, because no other decision of the Commission has had such a profound impact on the federal prison population. The drug trafficking guideline . . . had the effect of increasing prison terms far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes.[49]

3. *The Guidelines Ranges for Drug Trafficking Offenses are Overly Punitive; They Subject All Drug Offenders to the Weight-Driven Regime the ADAA Intended Only for Managers and Leaders*

The Commission's linkage of the Guidelines ranges for drug trafficking offenses to the ADAA's weight-driven regime has resulted in a significantly more punitive sentencing grid than Congress intended in passing the ADAA. As discussed above, the legislative intent behind the ADAA's two-tiered mandatory minimum provisions was to specifically target and punish managers and leaders of drug enterprises. The overwhelming majority of drug trafficking offenders are neither managers or leaders – in Fiscal Year 2011, roughly 93% of drug trafficking offenders did not fall into either of those leadership categories.[50] But the Guidelines ranges for drug trafficking offenses elevate all offenders – no matter their role in the offense – to those categories so long as the offense triggers the threshold quantities of heroin, cocaine, or crack.[51]

---

[49] *Id*.

[50] I calculated this percentage by comparing the number of drug offenders for heroin, cocaine, and crack offenses who did not receive an aggravating role adjustment against the total number of drug offenders for these drug types. U.S. SENTENCING COMM'N, 2011 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS 109 tbl. 40 (2011) [hereinafter 2011 SOURCEBOOK]. These offenders include a small percentage of those sentenced for drug offenses other than drug trafficking (§ 2D1.1). According to the Commission, roughly 94% of drug offenses are drug trafficking offenses. *Id*. at 101, fig. 1.

[51] In fact, for good measure, the Guidelines elevate those whose offense involves quantities triggering the mandatory minimums beyond those enhanced penalties. As mentioned above, a defendant whose offense involves one to three kilograms of heroin – a quantity triggering the 10-year mandatory minimum – will receive a range of 121-51 months (10 to 12 ½ years). *See* U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(a)(5) & (c)(4), ch. 5 pt. A (2012) (assuming the defendant has no criminal history and that no other adjustments apply). An

Moreover, by scaling punishment for greater and lesser quantities of drugs according to the ADAA's mandatory minimums, the Guidelines ranges increase the severity of drug trafficking sentencing ranges overall. As a result, the vast majority of federal drug offenders who are neither managers nor leaders are subjected to the harsh sentencing scheme that Congress intended only for those who occupy such roles.

Congress and the Commission have from time to time recognized the excessive severity of our drug trafficking sentences, and they have occasionally taken small steps to address it. In 1994 Congress enacted the "safety valve" statute to provide some offenders relief from the ADAA's mandatory minimum sentences.[52] The Commission thereafter promulgated a parallel safety valve adjustment to a qualifying defendant's Guidelines range.[53] In 2002 the Commission created a "mitigating role cap" in the computation of base offense levels for drug trafficking offenses, and it tinkers with that cap from time to time.[54] A recent amendment to the Guidelines even affords a very narrow category of drug offenders a super-minimal-role adjustment of six levels.[55] And of course there was the Commission's 2007 retroactive

---

actual kingpin's range would go up from there; with a four-level adjustment for an aggravating role in the offense, the range would be 188-235 months (15 to 19 ½ years). *Id*. § 3B1.1, ch. 5 pt. A.

[52] 18 U.S.C. § 3553(f).

[53] U.S. SENTENCING GUIDELINES MANUAL app. C, vol. I, amend. 509, 515 (2012); *id*. §§ 2D1.1(b)(16), 5C1.2.

[54] *Id*. app. C, vol. II, amend. 640; *id*. app. C, vol. III, amend. 668, 748, 750; *id*. §§ 2D1.1(a)(5); 3B1.2. The mitigating role cap provides a maximum base offense level for defendants who receive a mitigating role adjustment under the Guidelines. In articulating its reasons for the cap, the Commission explained: "The maximum base offense level somewhat limits the sentencing impact of drug quantity for offenders who perform relatively low level trafficking functions, have little authority in the drug trafficking organization, and have a lower degree of culpability (e.g. 'mules' or 'couriers' whose most serious trafficking function is transporting drugs and who qualify for a mitigating role adjustment.) Th[e] . . . amendment responds to concerns that base offense levels derived from the Drug Quantity Table in § 2D1.1 overstate the culpability of certain drug offenders who meet the criteria for a mitigating role adjustment under § 3B1.2."). *Id*. app. C, vol. II, amend. 640.

[55] *Id*. app. C, vol. III, amend. 748; *id*. §§ 2D1.1(b)(15), 3B1.2(a). The amendment affords an additional two-level downward adjustment for offenders who have already received a "minimal participant" mitigating role adjustment if they (1) were "motivated by an intimate or familial relationship or by threats or fear to

amendment lowering sentencing ranges for crack offenses,[56] as well as the Fair Sentencing Act

of 2010, which increased the crack quantities triggering the mandatory minimums (leading to

retroactive amendments to the corresponding Guidelines ranges).[57]

These efforts, commendable in spirit, amount to gnats around the ankles of the

elephant. Putting aside the overly-restrictive eligibility requirements,[58] safety valve relief from a

---

commit the offense;" (b) "received no monetary compensation" for the offense; and (c) "had minimal knowledge of the scope and structure of the enterprise."

[56]     *Id.* at amend. 706, 713. The retroactive amendment modified the crack quantity thresholds for determining base offense levels, adjusting the sentencing ranges for crack offenses downward by two levels. The base offense level for offenses with crack quantities triggering the 5-year mandatory minimum was reduced from 26 (63 to 78 months) to 24 (51 to 63 months). The base offense level for offenses with crack quantities triggering the 10-year mandatory minimum was likewise reduced from 32 (121-51 months) to 30 (97-121 months).

[57]     Fair Sentencing Act of 2010, Pub. L. No. 111-220, § 2(a), 124 Stat. 2372 (codified as amended in scattered sections of 21 U.S.C.); U.S. SENTENCING GUIDELINES MANUAL app. C, vol. III, amend. 748, 750, 759 (2012). The Fair Sentencing Act ("FSA") increased the crack quantity thresholds for triggering the ADAA's mandatory minimum penalties from 5 to 28 grams (for the five-year mandatory minimum) and 50 to 280 grams (for the ten-year mandatory minimum). These increased quantities reduced the disparity between the amount of cocaine and crack needed to trigger the mandatory minimums from a 100:1 to an 18:1 ratio.

When the Commission adopted the retroactive amendments corresponding to the FSA, it essentially undid its 2007 retroactive amendment adjusting the sentencing ranges for crack offenses downward by two levels. *See supra* note 56. Thus, the FSA amendments revert to assigning a base offense level of 26 to offenses with (the now increased) crack quantities triggering the five-year mandatory minimum and a base offense level of 32 to offenses with quantities triggering the ten-year mandatory minimum. U.S. SENTENCING GUIDELINES MANUAL app. C, vol. III, amend. 748 (2012). The Commission restored these base offense levels against objections from many quarters, including from then-Commissioner Judge Ruben Castillo and several legislators. United States Sentencing Commission Public Meeting Minutes 4-5 (Oct. 15, 2010) ("Vice Chair Castillo stated that the Act does not contain any clear congressional intent that the base offense levels be set at levels 26 and 32. . . . He added that the Commission can assume that Congress was aware that in 2007 the Commission lowered the base offense levels for crack offenders to levels 24 and 30. Vice Castillo turned to the public comment from members of Congress. He observed that the chairmen of the House of Representatives's Committee on the Judiciary and the Subcommittee on Crime, Terrorism and Homeland Security commented that setting the base offense levels at 26 and 32 was not consistent with the Act's intent. Vice Chair Castillo stated that Senator Richard Durbin, the bill's sponsor, commented that the appropriate base offense level is 24 and that there is no need for an increase.").

[58]     To be eligible for safety valve relief, both the statute and the Guidelines require a defendant to satisfy five criteria. *See* note 6 and accompanying text. The first of these requirements – that a defendant have no more than one criminal history point – is unnecessarily rigorous. The Guidelines prescribe, for example, two points if "the defendant committed the instant offense while under any criminal justice sentence." U.S. SENTENCING GUIDELINES MANUAL § 4A1.1(d) (2012). So a defendant who commits even a minor drug offense while under supervision for another minor offense, say a shoplifting conviction, is disqualified. To its credit, the Commission recently recommended that Congress expand the safety valve to include defendants with more than one criminal history report. MANDATORY MINIMUM REPORT, *supra* note 34, at 355-56. While that request is pending (and

mandatory minimum does no more than relegate the defendant to a Guidelines range that matches, and even exceeds, the mandatory minimum. Even with the Commission's corresponding two-level safety valve adjustment, the defendant still has a range that embraces the mandatory minimum. Diaz is an example. His offense involved one kilogram of heroin, subjecting him to a ten-year mandatory minimum sentence. The safety valve takes away the mandatory minimum and gives him the two-level downward adjustment, but Diaz is still subject to a within-range sentence of up to 121 months, *i.e.* more than the mandatory minimum itself, and a Guidelines range minimum of more than 8 years.

The mitigating role cap helps very few defendants. Roughly 13% of those convicted of drug trafficking offenses in Fiscal Year 2011 received a mitigating role adjustment to begin with,[59] and not all of them qualified for the cap. In Fiscal Year 2011, only approximately 7% of all drug trafficking offenders received the cap.[60] Furthermore, like safety valve relief, the cap does little to significantly lower a qualifying defendant's sentencing range below the mandatory minimum. The cap, which is pegged to the defendant's original base level, can go no lower than level 30, which corresponds to a sentencing range of 97-121 months (8 to 10 years).[61] Finally, the super-minimal-role adjustment benefits even fewer defendants, who

chances are that it will remain pending for the foreseeable future), the Commission should make the same amendment to the Guidelines' safety valve adjustment that it would like Congress to make to the statute.

[59] I calculated this percentage by comparing the number of drug offenders for heroin, cocaine, and crack offenses who received a mitigating role adjustment against the total number of drug offenders for these drug types. 2011 SOURCEBOOK, *supra* note 50, tbl. 40. Again, these numbers include a small percentage of those sentenced for drug offenses other than drug trafficking (§ 2D1.1). *See* note 50 and accompanying text.

[60] E-mail from Louis Reedt, Acting Deputy Director, Office of Research and Data, United States Sentencing Commission, to the Honorable John Gleeson, United States District Court, Eastern District of New York (Nov. 29, 2012, 8:54 AM EST) (on file with chambers). This percentage includes offenders convicted of trafficking in all drug types, not just heroin, cocaine, and crack.

[61] The original mitigating role cap simply provided that defendants who received a mitigating role adjustment under the Guidelines could not receive a base offense level higher than 30. U.S. SENTENCING GUIDELINES MANUAL app. C, vol. II, amend. 640 (2012). Subsequent amendments to the cap have complicated the picture in a manner adverse to defendants. Now qualifying defendants whose original base offense level is (1) 32

must meet ever-more stringent criteria to qualify.[62]  In Fiscal Year 2011, only 0.2% of total drug trafficking offenders received this adjustment.[63]

In sum, each of these ameliorative measures fits the description the Chair of the Commission himself gave the 2007 retroactive downward adjustment to crack sentencing ranges – "a very small step with regards to correction of a problem."[64]  They nibble around the edges of a sentencing framework myopically focused on drug weight and unreasonably moored to mandatory minimums intended for high-level drug traffickers.  They mitigate sentences slightly but still leave low-level offenders facing prison terms suitable for a drug boss.  It is past time for some larger steps to be taken.

4.  *The Guidelines Ranges for Drug Trafficking Offenses Have Never Been "Heartlands," and the Commission Has Never Adapted to that Reality*

When the Commission promulgated the first Guidelines Manual in 1987, it explained that it "intend[ed] the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes."[65]  It also predicted that even though sentencing judges were legally authorized to depart from the applicable ranges, "they will not do so very often," because "the guidelines, offense by offense, seek to take account of those factors that the Commission's sentencing data indicate make a

---

receive a 2-level reduction; (2) 34 or 36 receive a 3-level reduction; and (3) 38 receive a 4-level reduction.  *Id.* §§ 2D1.1(a)(5), 3B1.2; *id.* app. C, vol. III, amend. 668.  In addition, defendants whose base offense level is greater than 32 and who qualify for a "minimal participant" mitigating role adjustment receive a decreased base offense level of 32.  *Id.* §§ 2D1.1(a)(5), 3B1.2(a); *id.* app. C, vol. III, amend. 748, 750.

[62]        *See* note 55and accompanying text.

[63]        E-mail from Louis Reedt, Acting Deputy Director, Office of Research and Data, United States Sentencing Commission, to the Honorable John Gleeson, United States District Court, Eastern District of New York (Oct. 22, 2012, 12:49 PM EST) (on file with chambers).  This percentage includes offenders convicted of trafficking in all drug types, not just heroin, crack, and cocaine.

[64]        U.S. Sentencing Comm'n, Transcript of Public Hearing on Retroactivity 8-9 (Nov. 13, 2007) (statement of Hon. Ricardo Hinojosa), *available at* http://www.ussc.gov/Legislative_and_Public_ Affairs/Public_Hearings_and_Meetings/20071113/Transcript111307.pdf.

[65]        U.S. SENTENCING GUIDELINES MANUAL § 1A4.B (1987).

significant difference in sentencing at the present time."[66]  But as discussed above, the

Commission completely abandoned its own data when formulating the Guidelines ranges for

drug trafficking offenses; instead, it simply made the quantity-based mandatory minimums in the

ADAA proportionately applicable to *every* drug trafficking offense.

        If the Guidelines ranges for drug trafficking offenses were truly heartlands, the

Commission's data would show it.  Aggravating circumstances occur just as frequently as

mitigating ones, so if the Commission had gotten it right, the number of sentences below the

applicable range would be at least roughly equal to the number of above-range sentences.  But

the Commission's own data over the years have illustrated just how wrong it was.  In Fiscal Year

1996, the first year that the Commission published its annual SOURCEBOOK OF FEDERAL

SENTENCING STATISTICS, there were roughly 39 downward departures for every upward

departure in drug trafficking cases.[67]  And instead of sidling up to those ranges over time, judges

drifted further away.  In 1998, there were roughly 54 downward departures for every upward

one; in 2000, the ratio was 68:1; and in 2002, it was 73:1.[68]

        The Commission was not supposed to sit by silently while experience

demonstrated that its Guidelines ranges in drug trafficking cases were consistently overly

punitive.  In fact, there was every reason to believe that the excessive severity produced by the

---

[66]    *Id.*

[67]    I calculated this ratio by dividing the number of "downward departures" by the number of "upward departures" for drug trafficking offenses.  The Commission's data on departure rates by "primary offense category" do not differentiate by drug type, so these figures represent the ratio for all drug types.  *See* UNITED STATES SENTENCING COMM'N, 1996 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (1996).

[68]    I calculated these ratios by dividing the number of "other downward departures" (i.e. non-"substantial-assistance departures") by the number of "upward departures" for drug trafficking offenses.  Again, the Commission's data on departure rates by "primary offense category" do not differentiate by drug type, so these figures represent the ratio for all drug types.  U.S. SENTENCING COMM'N, 2002 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2002); U.S. SENTENCING COMM'N, 2000 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2000); U.S. SENTENCING COMM'N, 1998 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (1998).

Commission's decision to link the Guidelines to the ADAA's mandatory minimum provisions would be eliminated over time. The SRA instructs the Commission to "establish sentencing policies and practices" that, *inter alia*, "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."[69] Thus, the Introduction to the first Guidelines Manual contains the assurance that "these initial guidelines are but the first step in an evolutionary process" and that "experience with these guidelines will lead to additional information and provide a firm empirical basis for revision."[70] Today's Manual provides the same assurance. It promises "continuing review" by the Commission and the revision of sentencing policies based upon, among other things, "application experience" and "as more is learned about what motivates and controls criminal behavior."[71]

But the promise of evolving Guidelines – of drug trafficking ranges revised based on application experience – has gone unfulfilled. And sentences below the Guidelines range remain the rule rather than the exception for drug trafficking offenses. In the post-*Booker* era, there have been an average of 23 non-government sponsored downward departures for every upward departure in a drug trafficking case.[72] The Guidelines ranges are not now, and have

---

[69] 28 U.S.C. § 991(b)(1)(C); *see also id*. at § 994(o) ("The Commission periodically shall review and revise, in consideration of comments and data coming to its attention, the guidelines promulgated pursuant to the provisions of this section. In fulfilling its duties and in exercising its powers, the Commission shall consult with authorities on, and individual and institutional representatives of, various aspects of the Federal criminal justice system.").

[70] U.S. SENTENCING GUIDELINES MANUAL §§ 1.A.3, 1.A.5 (1987).

[71] U.S. SENTENCING GUIDELINES MANUAL § 1.A.2 (2012).

[72] I calculated this ratio by averaging the ratios of non-government sponsored downward departures ("downward departure," "downward departure with *Booker*," "below range with *Booker*," and "remaining below range") to upward departures ("upward departures," "upward departures with *Booker*," "above range with *Booker*," and "remaining above range") for Fiscal Years 2006, 2007, 2008, 2009, 2010, and 2011. 2011 SOURCEBOOK, *supra* note 50, at tbl. 27; U.S. SENTENCING COMM'N, 2010 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2010); U.S. SENTENCING COMM'N, 2009 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2009); U.S. SENTENCING COMM'N, 2008 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2008); U.S. SENTENCING COMM'N, 2007 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2007); U.S. SENTENCING COMM'N, 2006 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2006). Even in the period following the enactment of

never been, the "heartlands" the Commission sought to establish. By refusing to acknowledge this reality, the Commission has violated its statutory duty to promulgate Guidelines reflecting application experience and "advancement in knowledge of human behavior."

How far out of line are the drug trafficking ranges? The degree to which sentencing judges vary downward provides a clue. In the period from December 11, 2007 to September 30, 2010, the average reduction from the bottom end of the applicable sentencing range in non-government sponsored below-range sentences was 39 months for crack offenses (32.7% reduction) and 27 months for cocaine and heroin offenses (respectively, 33.7% and 37.2% reductions).[73] As a result, the average sentence for *all* crack cases has consistently been about 30 months below the applicable Guidelines range minimum, and the average sentences in cocaine and heroin cases have just as consistently been about 20 months below the bottom end of the applicable range.[74]

The Commission should learn from its own mistakes and fix these ranges. The last time it ignored a consistent and ever-increasing rate of below-range sentences Congress took it to the woodshed, in the form of the Feeney Amendment to the Prosecutorial Remedies and

---

the Feeney Amendment to the PROTECT Act but prior to *Booker*, the ratio was skewed significantly – 18:1 – towards downward departures. Pub. L. No. 108-21, 117 Stat. 650 (2003) (codified in scattered sections of 18, 28, 42, and 47 U.S.C.); *see* U.S. SENTENCING COMM'N, 2005 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2005); U.S. SENTENCING COMM'N, 2004 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS tbl. 27 (2004). For a discussion of the Feeney Amendment, *see infra* note 75 and accompanying text.

[73] Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Prepared Testimony Before the Subcommittee on Crime, Terrorism, and Homeland Security, Committee on the Judiciary, United States House of Representatives (Oct. 12, 2011), at 33, 36, 43, *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Testimony/20111012 _Saris_Testimony.pdf.

[74] *Id.* at app. A; *see also* U.S. SENTENCING COMM'N, PRELIMINARY QUARTERLY DATA REPORT: 3RD QUARTER RELEASE, PRELIMINARY FISCAL YEAR 2012 DATA, THROUGH JUNE 30, 2012 37, fig. H (2012) (depicting the average sentence in all drug trafficking cases from Fiscal Years 2007 to 2011 to be about 20 months below the bottom end of the average Guidelines range minimum).

Other Tools to End the Exploitation of Children Today Act of 2003 ("PROTECT Act").[75]  As ill-advised as the Feeney Amendment was,[76] it's hard to blame Congress for acting when the Commission fails to do its job.

　　　　If the Commission wants greater adherence to the Guidelines, as it should, it needs to get better at fixing broken offense guidelines.  The drug trafficking offense guideline was *born* broken.  Many judges will not respect it because as long as the sentences it produces

---

[75]　　　Pub. L. No. 108-21, 117 Stat. 650 (2003) (codified in scattered sections of 18, 28, 42, and 47 U.S.C.)  The Feeney Amendment addressed what its proponents perceived to be "long-standing and increasing problems of downward departures from the Federal sentencing guidelines."  149 Cong. Rec. H2422 (daily ed. Mar. 27, 2003) (statement of Rep. Feeney).  In 2003 the Commission reported to Congress, as required by the Feeney Amendment, that "[b]etween fiscal years 1991 and 2001, the downward departure rate increased from 5.8 percent to 18.1 percent, increasing an average of 1.2 percentage points in any given year."  U.S. SENTENCING COMM'N, REPORT TO CONGRESS ON DOWNWARD DEPARTURES FROM THE FEDERAL SENTENCING GUIDELINES 31 (2003) ("Substantial assistance" departures also increased during this period, albeit at a slower rate, from 11.9 percent to 17.4 percent.  *Id*.  Prior to the Feeney Amendment, substantial assistance departures pursuant to § 5K1.1 were the only departures made by the court upon motion of the government.)

　　　　What the proponents of the Feeney Amendment failed to understand was that the increase in non-substantial assistance downward departures was largely attributable to government-supported "fast-track" departures in border districts.  *See* Letter from American Bar Association to Rep. Scott (Apr. 9, 2003), reprinted in 149 Cong. Rec. H2067 (statement of Rep. Scott).  "Fast-track" departure programs emerged in border districts with enormous volumes of criminal immigration cases; under these programs, defendants receive sentences below their applicable Guidelines range in exchange for a prompt guilty plea and waiver of certain rights.  Had the supporters of the Feeney Amendment excluded "fast-track" departures from the number of non-substantial assistance downward departures, the percentage of cases with such departures would have dropped to roughly 10 percent.  149 Cong. Rec. S5119 (Sen. Kennedy) ("In 2001, when we exclude those districts with departure policies designed to address the high volume of immigration caseloads, the non-substantial assistance departure rate is merely 10.2 percent. . . . Indeed, the vast majority of downward departures granted by judges today are those sought by the government, most to reward substantial assistance in the prosecution of crime.  And, while departures have increased somewhat of late, government initiated departures lead the rising departure rate.").

　　　　In other words, the Commission's failure to adapt the Guidelines to account for actual sentencing developments in immigration cases produced a red herring.  It falsely alerted Congress to a so-called "problem" of downward departures when the Guidelines' rigidity was the real cause for concern.

　　　　The Feeney Amendment was a humiliating rebuke of the Commission.  Congress simply bypassed the Commission altogether, making sweeping amendments to the Guidelines by legislation.  It also ordered the Commission to pass more amendments within six months to ensure the further reduction in downward departures. PROTECT Act, § 401(m)(2)(A).

[76]　　　The Amendment also imposed reporting requirements that drew an extraordinary reaction from Chief Justice Rehnquist in his year-end report.  WILLIAM H. REHNQUIST, 2003 YEAR-END REPORT ON THE FEDERAL JUDICIARY (Jan. 1, 2004) ("Collecting downward departure information on a judge-by-judge basis . . . seems to me somewhat troubling. . . .  The subject matter of the questions Congress may pose about judges' decisions, and whether they target the judicial decisions of individual federal judges, could appear to be an unwarranted and ill-considered effort to intimidate individual judges in the performance of their judicial duties.").

are linked to the ADAA's mandatory minimums, they will be too severe. Indeed, as discussed further below, for almost two decades the nation's judges have been telling the Commission to de-link the drug trafficking offense guideline from those harsh mandatory minimums and to reduce the sentencing ranges.[77] The Commission should listen and act. It should use its resources, knowledge, and expertise to fashion fair sentencing ranges for drug trafficking offenses. That process will take time. In the meantime, because real people, families, and communities are harmed by the current ranges, it should immediately lower them by a third.

5. *The Guidelines Ranges for Drug Trafficking Offenses Have Contributed to Mass Incarceration*

Perhaps the best indication that the Guidelines ranges for drug trafficking offenses are excessively severe is the dramatic impact they have had on the federal prison population *despite* the fact that judges so frequently sentence well below them.

In 1984, when the Sentencing Reform Act was passed, the federal prison population was 34,263.[78] By 1994, it was 95,034;[79] by 2004, it was 180,328.[80] In 2011, there were 214,774 prisoners in the custody of the federal government.[81] The Federal Bureau of Prisons ("BOP") is now the largest corrections system in the country.[82]

The increased severity of federal drug trafficking sentences is an integral part of the story of mass incarceration.[83] In less than a decade, from 1985 to 1991, the length of federal

---

[77]     *See infra* Part C.3.

[78]     U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN STATE AND FEDERAL INSTITUTIONS ON DECEMBER 31, 1984 12 tbl. 1 (1987).

[79]     U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES, 1994 66 tbl. 5.1 (1996).

[80]     U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2004 3 tbl. 3 (2005).

[81]     U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, CORRECTIONAL POPULATIONS IN THE UNITED STATES 8 App'x tbl. 1 (2012).

[82]     FIFTEEN YEAR REPORT, *supra* note 46, at 40.

[83]     *Id.* at 48 ("Increases in sentence lengths for drug trafficking offenders are the major cause of federal prison population growth over the past fifteen years."); *id.* at 49 ("[T]he Drug Quantity Table extends the

drug trafficking sentences increased by over two-and-a-half times.[84]  Sentences for drug

trafficking were "elevated above almost every serious crime except murder."[85]  The increase in

sentence length for drug offenders "was the single greatest contributor to growth in the federal

prison population between 1998 and 2010."[86]

        While the ADAA certainly resulted in increased sentence lengths, the

Commission itself has acknowledged that its decision to link the sentencing ranges for drug

trafficking offenses to the ADAA also "had a dramatic impact on federal sentencing policy for

drug offenders."[87]  As discussed above, the ADAA introduced an enhanced sentencing scheme

---

quantity-based approach across 17 different levels falling below, between, and above the two amounts specified in the statutes. . . . [N]o other decision of the Commission has had such a profound impact on the federal prison population.  The drug trafficking guideline . . . had the effect of increasing prison terms far above what had been typical in past practice, and in many cases above the level required by the literal terms of the mandatory minimum statutes.").  I acknowledge that there was also an increase in the number of drug prosecutions during this period. *See* U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, FEDERAL DRUG OFFENDERS, 1999, WITH TRENDS 1984-99 7 (2001) ("Between 1994 and 1999, the number of defendants charged with a drug offense in U.S. district courts increased about 3% annually, on average, from 11,854 to 29,306.").

[84]        FIFTEEN YEAR REPORT, *supra* note 46, at 53 ("The time served by federal drug traffickers was over two and a half times longer in 1991 than it has been in 1985, hovering just below an average of 80 months."); *see also* Paul J. Hofer & Courtney Semisch, *Examining Changes in Federal Sentence Severity: 1980-1998*, 12 FED. SENT. R. 12, 17 (1999) (nearly three-fold increase in time served for drug offenders between 1984 and 1992); U.S. GOV'T ACCOUNTABILITY OFFICE, BUREAU OF PRISONS: GROWING INMATE CROWDING NEGATIVELY AFFECTS INMATES, STAFF, AND INFRASTRUCTURE app. II (2012) [hereinafter GAO, GROWING INMATE CROWDING] ("The average time an inmate served for drug offenses increased 250 percent after 1987, when the U.S. Sentencing Commission revised the U.S. Sentencing Guidelines in order to implement the Sentencing Reform Act of 1984.").  While the average prison term for drug trafficking offenses "decreased by about 20 percent" in the late 1990s, it remained "far above the historic average."  FIFTEEN YEAR REPORT, *supra* note 46, at 53.

[85]        U.S. DEP'T OF JUSTICE, NAT'L INST. OF JUSTICE, AN ANALYSIS OF NON-VIOLENT DRUG OFFENDERS WITH MINIMAL CRIMINAL HISTORIES 12 (1994) [hereinafter DOJ, MINIMAL CRIMINAL HISTORIES]; *see also id.* at 44 ("For criminal history category I offenders [in 1992], the following median sentences are listed by offense: murder, 170 months; drug trafficking, 60 months; kidnapping/hostage-taking, 57 months; robbery, 51 months; arson, 36.5 months; racketeering/extortion, 36 months; assault, 24 months; and firearms, 15 months.").

[86]        KAMALA MALLIK-KANE, BARBARA PARTHASARATHY & WILLIAM ADAMS, URBAN INSTITUTE, EXAMINING GROWTH IN THE FEDERAL PRISON POPULATION, 1998 TO 2010 3 (2012).

[87]        FIFTEEN YEAR REPORT, *supra* note 46, at 53; *id.* at 54 ("[T]he guidelines have significantly increased average sentence length above the levels required by statute.  About 25 percent, or eighteen months, of the average expected prison time of 73 months for drug offenders sentenced in 2001 can be attributed to guideline increases above the mandatory minimum penalty levels."); *see also* TONRY, *supra* note 40, at 97 (explaining why the Commission's approach necessarily increased sentences); BARBARA S. VINCENT & PAUL J. HOFER, FEDERAL JUDICIAL CENTER, THE CONSEQUENCES OF MANDATORY MINIMUM PRISON TERMS: A SUMMARY OF RECENT

to punish the small minority of offenders who served as managers or leaders of drug enterprises. The Guidelines, by making the ADAA's enhanced sentences proportionately applicable to *every* drug trafficking offense, elevated sentences for all drug defendants. Indeed, as mentioned above, they actually set sentencing ranges slightly above those required by the mandatory minimums.[88]

In 1984, only 30% percent of the federal prison population was serving sentences for drug offenses.[89] By 2004, that number was about 54%.[90] In 2011, drug offenders continued to constitute a majority – just over 50% – of the federal prison population.[91]

Mass incarceration comes at great cost; prison is expensive. The annual cost of housing a prisoner is $21,006 for a minimum-security facility; $25,378 for a low-security

---

FINDINGS 3 (1994) ("[T]he mandatory minimums have influenced, and some would say distorted, the guidelines and thus the entire federal sentencing structure."). When the Commission first developed the Guidelines, it was well aware that federal drug sentences would increase dramatically going forward. SUPPLEMENTARY REPORT, *supra* note 30, at 18 ("[T]he sentences for drug offenses, which reflect the recent passage of the Anti-Drug Abuse Act, are much higher than in current practice."). At the time, however, it incorrectly attributed virtually all of the increase to the ADAA and the career offender provision (which itself is mandated by the Sentencing Reform Act, 28 U.S.C. § 994(h)). *See id.* at 61.

[88] VINCENT & HOFER, *supra* note 87, at 3 ("The guideline levels were set by the Sentencing Commission so that the length of imprisonment for all but the least culpable offenders is longer than the length required by the mandatory minimums.").

[89] SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS 2003 519 tbl. 6.57 (2005). The Sourcebook cites an exact figure of 29.5%, but its figure for the federal prison population in 1984 (32,317) is slightly lower than that cited by DOJ's Bureau of Justice Statistics. *See* note 78. This percentage includes those serving time for all drug offenses, not just drug trafficking offenses.

[90] SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS 2003, *supra* note 89, at 519 tbl. 6.57. The Sourcebook cites an exact figure of 54.1%, but its figure for the federal prison population in 2004 (154,706) is significantly lower than that cited by DOJ's Bureau of Justice Statistics. *See* note 80. But that percentage seems reasonable in light of the fact that DOJ estimates that about 55% of the federal prison population in 2003 and 53% of the population in 2006 consisted of offenders serving time for drug offenses. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2006 9 tbl. 12 (2007); PRISONERS IN 2004, *supra* note 80, at 10 tbl. 14. (DOJ's Bureau of Statistics does not seem to have a readily available figure for the number of offenders serving time for drug offenses in 2004.)

[91] SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS ONLINE tbl. 6.0023.2011, http://www.albany.edu/sourcebook/pdf/t600232011.pdf (last visited Jan 25, 2013). The Sourcebook cites an exact figure of 50.7%; its figure for the federal prison population in 2011 (217,208) is only slightly lower than that cited by DOJ's Bureau of Justice Statistics. *See* note 81.

facility; $26,247 for a medium-security facility; and $33,930 for a high-security facility.[92] The President's Fiscal Year 2013 budget request for BOP is over $6.9 billion dollars, an increase of $278 million or 4.2% from the Fiscal Year 2012 budget.[93] The BOP budget request accounts for about 25% of DOJ's overall budget request.[94] We will spend almost exactly as much on federal prisons alone as we do on the entire federal judiciary.[95]

DOJ recently acknowledged and bemoaned the ballooning costs of our federal prison system. It observed that our present "budgetary environment" means that "the current trajectory of corrections spending will lead to . . . imbalances in the deployment of justice resources."[96] The continued increase in the federal prison population has already required DOJ to allocate ever more resources towards prisons, at the expense of other public safety priorities. In Fiscal Year 2012, DOJ found its "budget directed toward incarceration and detention grew by several hundred million dollars," and that "[t]o pay for this within the overall budget limits meant that aid to state and local law enforcement, grants for prevention and intervention programs, and resources for prisoner reentry all had to be cut by millions of dollars."[97] It warned that we "are now on a funding trajectory that will result in more federal money spent on imprisonment and less on police, investigators, prosecutors, reentry, and crime prevention."[98]

---

[92] U.S. GOV'T ACCOUNTABILITY OFFICE, BUREAU OF PRISONS: ELIGIBILITY AND CAPACITY IMPACT USE OF FLEXIBILITIES TO REDUCE INMATES' TIME IN PRISON 19 fig. 3 (2012).

[93] U.S. DEP'T OF JUSTICE, FEDERAL PRISON SYSTEM (BOP) FY 2013 BUDGET AND PERFORMANCE SUMMARY (2012).

[94] U.S. DEP'T OF JUSTICE, OVERVIEW FY 2013 BUDGET AND PERFORMANCE SUMMARY (2012).

[95] JOHN G. ROBERTS, JR., 2012 YEAR-END REPORT ON THE FEDERAL JUDICIARY (Dec. 31, 2012) ("In fiscal year 2012, the Judiciary, including the Supreme Court, other federal courts, the Administrative Office of the United States Courts, and the Federal Judicial Center, received a total appropriation of $6.97 billion.").

[96] Letter from Lanny A. Breuer, Assistant Attorney General & Jonathan J. Wroblewski, Director, Office of Policy and Legislation, to Hon. Patti B. Saris, Chair, U.S. Sentencing Comm'n 5 (July 23, 2012), *available at* http://www.justice.gov/criminal/foia/docs/2012-annual-letter-to-the-us-sentencing-commission.pdf.

[97] Matthew Axelrod, *Testimony on Behalf of the U.S. Department of Justice before the U.S. Sentencing Commission, February 16, 2012*, 24 FED. SENT'G REP. 348, 348 (2012).

[98] *Id.*

Despite increased spending on our federal prisons, the continued growth in the prison population has resulted in overcrowding, endangering the safety of prisoners and prison staff. According to DOJ, BOP "is currently operating at 38% over rated capacity."[99] Overcrowding is of acute concern at higher-level facilities, which house the most serious offenders, "with 53% crowding at high-security facilities and 49% at medium security facilities."[100] In DOJ's assessment, "[t]his level of crowding puts correctional officers and inmates alike at greater risk of harm and makes recidivism reduction far more difficult."[101] BOP projects that the federal prison population "will continue to grow by more than 5,000 prisoners a year for the foreseeable future," a forecast DOJ described as "troubling."[102]

The states have gotten smarter and more cost-effective. They have adopted reforms, grounded in research and analysis, that have reduced their prison populations while improving criminal justice outcomes.[103] The bulk of these reforms are directed at non-violent offenders, particularly drug offenders. States have reduced prison terms for such offenders, by relaxing mandatory sentencing laws and creating or expanding alternative sentencing programs, such as treatment and counseling (rather than incarceration) for substance-abusing offenders.[104] States have also invested in "problem-solving courts," such as drug treatment courts, which utilize judicial supervision and a broad spectrum of sanctions and incentives to reduce recidivism and substance abuse.[105]

---

[99]    Letter from Breuer to Saris, *supra* note 96, at 5; *see also* Axelrod, *supra* note 97, at 349; GAO, GROWING INMATE CROWDING, *supra* note 84.

[100]    Letter from Breuer to Saris, *supra* note 96, at 6.

[101]    *Id*.

[102]    Axelrod, *supra* note 97, at 349; GAO, GROWING INMATE CROWDING, *supra* note 84, at 12.

[103]    *See* VERA INSTITUTE OF JUSTICE, THE CONTINUING FISCAL CRISIS IN CORRECTIONS: SETTING A NEW COURSE (2010).

[104]    *Id*. at 16-17.

[105]    *Id*. at 18.

Policymakers in the federal arena have failed to meaningfully consider cost-effective solutions to what DOJ describes as "unsustainable" increases in the federal prison population and prison expenditures.[106] DOJ has called on the Commission to begin by reviewing federal sentencing policy – "both systemically and on a crime-by-crime basis – through the lens of public safety spending productivity."[107] It has expressed confidence that "many . . . crime-specific areas . . . warrant substantive reexamination."[108] The drug trafficking offense guideline is a good place to start. Based on a principle of abstract proportionality to the ADAA, it produces excessively long prison terms. If our drug trafficking offense sentences were based instead on empirical data, application experience, and a clear-eyed focus on getting the most bang for our incarceration buck, we would incarcerate fewer people for far less time.

---

[106] Letter from Breuer to Saris, *supra* note 96, at 5; *cf.* GAO, GROWING INMATE CROWDING, *supra* note 84, at 32-33 (observing that "states have been able to take broader actions than BOP to reduce their prison populations because these states have legislative authority that BOP does not have"); THE PEW CENTER ON THE STATES, PRISON COUNT 2010 6 (2010) ("The federal prison population has grown at a far faster rate than has the state prison population, more than doubling since 1995. Despite the decline in the state prison population in 2009, the number of prisoners under the jurisdiction of the Federal Bureau of Prisons continued to increase rapidly . . . . On balance, the federal system has tougher sentencing laws, more restrictive supervision policies and fewer opportunities for diversion of defendants."). In 2008 the Commission held a two-day national symposium on alternatives to incarceration with the purpose of "gather[ing] information regarding the use of alternatives to incarceration and to provide a forum for idea-sharing concerning possible implementation of non-incarceration sanctions in the federal system." U.S. SENTENCING COMM'N, SYMPOSIUM ON ALTERNATIVES TO INCARCERATION 2 (2008). The symposium brought together judges, prosecutors, defense attorneys, and corrections officials at both the state and federal levels and "examined topics such as the use of drug courts, treatment options for certain offender populations, restorative justice-based programs, the Second Chance Act and re-entry issues, experiences with intermediate sanctions, and collateral consequences of convictions." *Id.* But when it came to policy change, the symposium produced almost nothing. In 2010 the Commission passed an amendment it described as "expanding the availability of alternatives to incarceration." U.S. SENTENCING GUIDELINES MANUAL app. C, Vol. III, amend. 738 (2012); *id.* § 5C1.1 cmt. n.6. The amendment expanded Zones B and C of the sentencing table by one level each and provided that an alternative to incarceration may be appropriate for offenders falling within Zone C (offenders falling within Zone B are already eligible for a non-incarcerative sentence). *Id.*

[107] Letter from Breuer to Saris, *supra* note 96, at 6.

[108] *Id.*

C.       *The Commission Should De-Link the Guidelines from the ADAA*

Over twenty-five years of application experience have demonstrated the perverse outcomes generated by the Guidelines ranges for drug trafficking offenses. These ranges subject all drug trafficking defendants to the ADAA's enhanced sentencing scheme, which Congress expressly intended only for the managers and leaders of drug enterprises. As a result, sentencing judges have routinely departed from these Guidelines, which have never been the "heartlands" that the original Commission aspired to create. Despite these consistent departures, federal drug sentencing has contributed to the national crisis of mass incarceration. The answer is simple. The Commission should de-link the drug trafficking sentencing grid from the ADAA's weight-driven mandatory minimum sentences and reduce the Guidelines ranges for these offenses.

1.       *The Commission Should Revise the Drug Trafficking Guidelines to Better Reflect a Defendant's True Culpability*

As discussed above, the enhanced sentences Congress mandated to punish specific *roles* in drug trafficking offenses are triggered not by role but by drug type and quantity instead. By importing the ADAA's weight-driven approach into the Guidelines ranges for drug trafficking offenses, the Commission accepted the ADAA's flawed premise that drug quantity is the predominant factor in determining a defendant's true culpability.[109]

Drug quantity is not irrelevant in assessing a drug trafficking defendant's culpability, and there is nothing inherently wrong in the Guidelines taking drug quantity into

---

[109]       *See* DOJ, MINIMAL CRIMINAL HISTORIES, *supra* note 85, at 15 ("[D]rug quantities, as a result of the incorporation of the mandatory-minimums into the Sentencing Guidelines, are the single most important determinant of the drug offender's sentence length."); *id.* at 35 ("[D]rug amount has, by far, the most influence on a defendant's sentence length."); JUDICIAL CONFERENCE OF THE UNITED STATES, 1995 ANNUAL REPORT OF THE JCUS TO THE U.S. SENTENCING COMMISSION 2 (1995) ("[T]he Judicial Conference . . . encourages the Commission to study the wisdom of drug sentencing guidelines, which are driven virtually exclusively by the quantity or weight of the drugs involved."); Stephen J. Schulhofer, *Assessing the Federal Sentencing Process: The Problem Is Uniformity, Not Disparity*, 29 AM. CRIM. L. REV. 833, 854 (1992) ("Drug quantity, which should count as one among many sentencing factors, and not the most important one at that, [is] the *only* sentencing factor. In no other crime is the Guideline range so heavily determined by a single offense characteristic.").

account.  If all else is equal, a dealer who sells 50 kilograms of heroin inflicts more harm on society, and deserves greater punishment, than one who sells one kilogram.  But two drug trafficking cases are rarely alike in all respects except quantity.  Numerous factors distinguish one drug offender's culpability from another.  What was the defendant's role?  What was his compensation?  Did he have a proprietary interest in the drugs?  How long was he involved in drug trafficking?  Why did he get involved to begin with?  Did he stop because he was arrested or for some other reason?

Drug quantity rarely has the dominant effect that Congress and the Commission have ascribed to it, especially when it comes to determining the culpability of couriers and other low-level offenders.[110]  Take, for example, a courier who is paid to carry a suitcase filled with drugs.  For their own protection, high-level drug suppliers and distributors may intentionally hire an individual with no pre-existing relationship with the drug enterprise.[111]  The courier is unlikely to know if the suitcase contains 1,000 grams or 10,000 grams of a drug, or if it contains heroin, cocaine, or crack.  Moreover, there is generally no correlation between the modest fee the courier receives and those factors.[112]  And yet the Guidelines dictate that his sentencing range will rest primarily on those factors, which have little, if anything, to do with his actual culpability.

To further illustrate the point, compare two hypothetical defendants.[113] Defendant A recruits a large group of teenagers and organizes them to sell cocaine on several street corners.  While purchasing his first supply of 500 grams, Defendant A is arrested.  His

---

[110]     Schulhofer, *supra* note 109, at 854 ("Drug quantity is sometimes a plausible surrogate for an offender's dangerousness, culpability or level of organizational responsibility.  At best it is a crude surrogate.").

[111]     *See* Deborah Young, *Rethinking the Commission's Drug Guidelines: Courier Cases Where Quantity Overstates Culpability*, 3 FED. SENT. R. 63, 64 (1990).

[112]     *Id*.

[113]     I used a similar example in *Dossie*, 851 F. Supp. 2d at 481.

base offense level will be 26.[114]  He might then receive a 4-level upward adjustment for aggravating role, resulting in an adjusted offense level of 30.[115]  Defendant B is "an addict who is paid $300 to stand at the entrance to a pier and watch for the police while a boatload of cocaine is offloaded."[116]  If the boat happens to hold 150 kilograms or more of cocaine, Defendant B's base offense level will be 38.[117]  He might then receive a 4-level downward adjustment for being a minimal participant,[118] and also benefit from a mitigating role cap,[119] resulting in an adjusted offense level of 30.  Assuming no other adjustments are applicable and each defendant has a criminal history category of I, Defendants A and B would have the same Guidelines range of 97-121 months (8 to 10 years).  Adjust the quantities slightly or the magnitude of the role adjustments, and it is possible for a lookout or similar low-level offender to have a *higher* Guidelines range than a manager or leader.

That drug quantity is a poor proxy for culpability has been evident for two decades.  A DOJ report in 1994 found that "[r]egardless of the functional role a defendant played in the drug scheme, the drug amounts involved in the offense are similar across the roles."[120]  It found accordingly that even "[a]fter applying Guideline adjustments and downward departures, there is a great deal of overlap in the distribution of sentences among high-level dealers, street-

---

[114]    *See* U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(a)(5) & (c) (2012).

[115]    *See id.* § 3B1.1(a).

[116]    *Dossie*, 851 F. Supp. 2d at 481.

[117]    *See* U.S. SENTENCING GUIDELINES MANUAL §§ 2D1.1(a)(5), (c) (2012).

[118]    *See id.* § 3B1.2(a).

[119]    *See id.* § 2D1.1(a)(5).  The mitigating role cap provides that offenders with a base offense level of 38 who receive a mitigating role adjustment receive an additional 4-level downward adjustment.

[120]    DOJ, MINIMAL CRIMINAL HISTORIES, *supra* note 85, at 12.  DOJ examined role across four categories: high-level dealer, street-level dealer, courier, and peripheral role.  *Id.* at 45.  Interestingly, DOJ found that "[i]f there is a difference, street-level dealers were involved with less drug quantities than high-level dealers, couriers, or those with a peripheral role" and that "those with a peripheral role were involved with more drugs than couriers and street-level dealers and almost as much as high-level dealers."  *Id.*

level dealers, couriers, and those with a peripheral role."[121] In other words, "[b]ecause drug quantity is the primary determinant of sentences under the Guidelines," defendants with different roles, "whether peripheral or central to the drug scheme," were receiving similar sentences.[122]

The Commission itself has come to accept that "the quantity of drugs involved in an offense is not as closely related to the offender's function in the offense as perhaps Congress expected" when it adopted the ADAA.[123] Its own analysis of drug trafficking cases found that "[f]or *every* function, the quantity of drugs involved in the offense on average resulted in a median base offense level that included or exceeded the five-year mandatory minimum penalty," which Congress specifically intended to punish "serious" traffickers."[124] The Commission now recognizes that drug quantity is "just one of many important factors in determining the appropriate sentence for drug offenders."[125] Nevertheless, the drug trafficking offense guideline continues to be driven mainly by drug quantity.

A more useful factor in determining culpability is not quantity, but role. The managers and leaders of a drug organization actively plan the organization's activities, plot to increase its profits, and recruit its members. As a result, they are more likely to initiate crimes related to their drug enterprise and will be driven to increase the scale of those crimes. They are also more likely to commit new crimes in the future.[126] By contrast, a low-level dealer or courier

---

[121] *Id*. at 12.

[122] *Id*. at 17.

[123] MANDATORY MINIMUM REPORT, *supra* note 34, at 350.

[124] *Id*. at 350-51 (emphasis in original). The Commission attempts to blunt this finding by noting that "the impact of such penalties on certain drug offenders who perform lower-level functions is significantly ameliorated by the combined effect of the safety valve and downward guideline adjustments." *Id*. at 351. But as discussed above, the safety valve and mitigating role cap have stringent eligibility criteria and do little to significantly lower a qualifying offender's sentencing range below the mandatory minimum. *See supra* Part B.3.

[125] *Id*. at 349.

[126] *See* DOJ, MINIMAL CRIMINAL HISTORIES, *supra* note 85, at 3 ("Low-level drug law violators are much less likely than high-level defendants to reoffend after their release from prison and, if they do recidivate, they are unlikely to commit a crime of violence.").

is easily replaceable and does little to advance the overall goals of the drug organization.[127]  He or she may be driven to crime by poverty or addiction, problems that can be addressed without incarceration.[128]  He or she will be less likely to recidivate in the future; if a term of incarceration is imposed, "a short prison sentence is just as likely to deter them from future offending as a long prison sentence."[129]  Rational sentencing policies will favor lengthier sentences for managers and leaders than for low-level workers because of their respective roles, not because of the quantities of drugs that happen to be involved in their offenses.

The Guidelines take role into account, but not nearly enough.  Under §§ 3B1.1 and 3B1.2, an offender's base offense level may be increased or decreased by two to four levels based on his aggravating or mitigating role in the offense.  In other words, the Guidelines allow for up to eight levels of differentiation among offenders based on their role in the offense.  By contrast, it allows for up to 32 levels of differentiation among offenders based on drug quantity.[130]  Thus, a defendant whose offense involves heroin, cocaine or crack can receive a sentence under the Guidelines ranging from less than a year (10 months) to more than 24 years (293 months) based solely on drug quantity.[131]

The ossification of the role adjustment makes matters worse.  Only about 7% of drug trafficking defendants receive an aggravating role adjustment, and only about 13% receive a

---

[127]    *See* VINCENT & HOFER, *supra* note 87, at 12 ("[L]ow-level offenders are the type who are easily replaced in a drug ring and whose removal cannot realistically be expected to disrupt drug distribution.").

[128]    *See* Young, *supra* note 111, at 64 ("[Low-level drug] defendants are often young.  Some have held non-skilled jobs and only turned to being couriers when the employment ended.  Many are women, some with children, chosen in part because they are less likely to be stopped for matching a drug courier profile.").

[129]    *See* DOJ, MINIMAL CRIMINAL HISTORIES, *supra* note 85, at 3, 5.

[130]    The lower levels apply only to less serious drugs, such as marijuana.  For harder drugs, such as heroin, cocaine, or crack, the base offense level varies by 26 degrees, from 12 to 38.  U.S. SENTENCING GUIDELINES MANUAL § 2D1.1(c) (2012).

[131]    *Id.*  Ten months corresponds to the lower end of the Guidelines range for base offense level 12; 293 months corresponds to the upper end of the Guidelines range for base offense level 38.  These ranges assume that the defendant has no criminal history and that no other adjustments apply.

mitigating role adjustment.[132]  Thus, with respect to four out of five defendants, their sentencing ranges reflect no differentiation at all based on their role in the offense.  The result is that their sentences fail to reflect a highly important and factually nuanced measure of culpability.

Finally, by focusing on role as a more reliable proxy for culpability than drug type and quantity, I do not mean to suggest that the drug trafficking offense guideline can be amended so as to reliably provide an appropriate range for every case.  No workable guideline could ever do so.  Sentencing judges know that a full consideration of "the nature and circumstances of the offense and the history and characteristics of the defendant" implicates offense and offender characteristics that are too numerous and varied, and occur in too many different combinations, to be captured, much less quantified, in a guideline.[133]  It matters, for example, that Diaz had no proprietary stake in the drugs he helped someone else sell.  I also find it relevant that when the seller of the drugs decided to rip off his customer by having sham delivered instead of heroin, he or she did not let Diaz in on that fact.  These and other offense characteristics, as well as a wide array of offender characteristics the Guidelines do not even attempt to take into account, will be discussed and considered in determining the appropriate sentence for Diaz.  Even a well-considered drug trafficking offense guideline – one that reflects the work and expertise of the Commission – will inevitably leave a great deal of individualized judging to be done.

---

[132]      I calculated these percentages by comparing the numbers of drug offenders for heroin, cocaine, and crack offenses who received aggravating and mitigating role adjustments against the total number of drug offenders for these drug types.  2011 SOURCEBOOK, *supra* note 50, tbl. 40.  These numbers include a small percentage of those sentenced for drug offenses other than drug trafficking (§ 2D1.1).  *See* note 50 and accompanying text.  The Commission's data also demonstrates that a mitigating role adjustment is applied in only about half of cases involving couriers (defined as those who transport drugs using a vehicle or other equipment) and mules (defined as those who transport drugs internally or on their person).  MANDATORY MINIMUM REPORT, *supra* note 34, at 170.
[133]      18 U.S.C. § 3553(a)(1).

2. *The Commission's Reasons for Refusing to Revise the Guidelines Ranges for Drug Trafficking Offenses Are Wrong*

The Commission has defended its wholesale incorporation of the ADAA's mandatory minimums into its Guidelines ranges for drug trafficking offenses on a number of grounds.[134] First, it insists that it is merely fulfilling the Congressional mandates to promulgate Guidelines that are "consistent with all pertinent provisions of federal law,"[135] and to consider "the community view of the gravity of the offense."[136] Second, it claims that the Guidelines "provide[ ] for graduated, proportional increases based on drug quantity for the full range of possible drug types and quantities," which is another way of saying that it avoids "sentencing cliffs."[137] Finally, the Commission holds that the Guidelines reflect its "concurrence with Congress's judgment that the quantity of drug involved in an offense is an important measure of the seriousness of the offense and the culpability of the offender."[138]

Taking each in turn, the Commission's argument that the Guidelines are "consistent with all pertinent provisions of federal law" might be more persuasive if the ADAA's mandatory minimums were the only "pertinent provisions." But the Commission is also statutorily required to establish Guidelines that fulfill the purposes of sentencing set forth in § 3553(a) and that "reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process."[139] Over twenty-five years of application experience have demonstrated that the drug trafficking offense guideline is unnecessarily severe and produces unjust outcomes. By continuing to adhere to that guideline in the face of this

---

[134]  *See* MANDATORY MINIMUM REPORT, *supra* note 34, at 349 n.845; *id*. at 53-57.

[135]  *See id*. at 349 n.845 (citing 28 U.S.C. § 994(a) § (b)(1)).

[136]  *See id*. (citing 28 U.S.C. § 994(c)(4)).

[137]  *See id*.; FIFTEEN YEAR REPORT, *supra* note 46, at 50.

[138]  *See* MANDATORY MINIMUM REPORT, *supra* note 34, at 349 n.845.

[139]  28 U.S.C. § 991(b)(1)(A) & (C).

empirical evidence, the Commission is not furthering Congressional commands, but expressly contravening them.[140]

The Commission further contends that it is bound to link the Guidelines ranges for drug trafficking offenses to the ADAA's mandatory minimums by the command in the SRA to consider "the community view of the gravity of the offense." Its suggestion is that "the community" is somehow analogous to "Congress," and that, therefore, the ADAA's punishments reflect a "community view" within the meaning of the SRA, to which the Commission must defer. This contention does not withstand even the slightest scrutiny. The text of the relevant provision – 28 U.S.C. § 994(c) – makes clear that "the community view" refers to *local* community views, not the views of Congress. Specifically, the provision differentiates between "the community" and "the Nation as a whole," precluding the Commission's interpretation of "the community" as a proxy for Congress.[141]

---

[140]        *See* Rachel E. Barkow, *Sentencing Guidelines at the Crossroads of Politics and Expertise*, 160 U. PA. L. REV. 1599, 1616 (2012) ("The Commission would violate the command of § 3553(a)(2) by using mandatory minimums to set other sentences if those mandatory minimums did not fulfill one of the statute's goals."); *id.* at 1617 ("The Commission cannot ignore its statutory mandate to create a just sentencing regime based on knowledge and expertise and simply accept Congress's view about the sentence for one particular offense as the appropriate baseline for every other similar offense.").

[141]        28 U.S.C. § 994(c) provides as follows:

The Commission, in establishing categories of offenses for use in the guidelines and policy statements governing the imposition of sentences . . . shall consider whether the following matters, among others, have any relevance to the nature, extent, place of service, or other incidents of an appropriate sentence, and shall take them into account only to the extent that they do have relevance –

(1)  the grade of the offense;

(2)  the circumstances under which the offense was committed which mitigate or aggravate the seriousness of the offense;

(3)  the nature and degree of the harm caused by the offense, including whether it involved property, irreplaceable property, a person, a number of persons, or a breach of public trust;

(4)  *the community view of the gravity of the offense*;

(5)  the public concern generated by the offense;

More importantly, even if those mandatory minimums reflected the relevant community view regarding the gravity of drug trafficking offenses, they do not reflect a view as to *all* drug trafficking offenses. As discussed above, Congress explicitly intended the mandatory minimums to apply only to managers and leaders of drug organizations. Thus, the mandatory minimums reflect a view that those who hold leadership or managerial positions in drug organizations deserve serious punishment. They do not reflect a view that drug type and quantity must command proportionately severe punishments in *every* drug case. They certainly do not reflect a view that low-level drug offenders should spend many years, sometimes decades, behind bars merely because their crime involved relatively large quantities of drugs. In fact, the Guidelines would be more consistent with the "community view" of the seriousness of drug offenses if they pegged offense level to role, and other factors denoting culpability, rather than drug quantity.

The Commission's second argument in support of linking the Guidelines ranges to the ADAA's mandatory minimums is that doing so avoids "sentencing cliffs," where offenders could face "vastly different penalties depending on whether they reached the mandatory minimum threshold or fell just below it."[142] The drug trafficking offense guideline purportedly avoids such cliffs because plotting sentencing ranges on an axis of quantity produces a smooth slope of graduated punishment. But this abstract achievement does not further the goals of sentencing. If the sentencing ranges produced by the Guidelines were plotted an axis of

---

(6) the deterrent effect a particular sentence may have on the commission of the offense by others; and

(7) *the current incidence of the offense in the community and in the Nation as a whole*.

(emphasis added).

[142]     Barkow, *supra* note 140, at 1615.

culpability, the result would be anything but smooth.  The gentle slope that the Guidelines appear to produce disguises terrain that is actually quite treacherous.

De-linking the Guidelines from the mandatory minimums need not result in sentencing cliffs of any kind.[143]  If the mandatory minimums were used as Congress intended, small differences in drug quantity would not produce wildly divergent sentences.  Congress made a mistake when it made drug type and quantity proxies for role.  But, intentionally or not, it nevertheless created a way to ensure that the mandatory minimums would not be applied indiscriminately, that is, without regard to the defendant's role:  Congress left it up to prosecutors to decide when to charge a defendant with a specific drug quantity, thus triggering a mandatory minimum sentence.  As long as prosecutors use the mandatory minimums as Congress intended, there would be no sentencing cliffs.[144]  Low-level offenders, who comprise about 93% of all drug offenders, would not be charged with quantities that trigger a mandatory minimum and they would be sentenced based on their role in the offense in addition to other relevant factors.  Managers and leaders of drug operations would be charged with the appropriate mandatory minimum and receive much harsher sentences.  Sentences would thus fall along a smooth continuum of culpability, not quantity.

The Commission's final argument in defense of its Guidelines ranges for drug trafficking offenses is that it concurs with Congress that drug quantity is an important proxy for culpability.  But that correlation has since been debunked, as even the Commission has come to

---

[143]        It is worth noting, moreover, that sentencing cliffs "are hardly new to criminal law."  *Id*. at 1616. Whenever Congress "opts to set mandatory penalties on the basis of bright-line thresholds, it anticipates that cliffs will result."  *Id*.  Accordingly, the Commission should not "focus on avoiding these disparities in sentencing at the expense of [its] expert judgment[ ] about where sentences should be set."  *Id*.

[144]        To be sure, prosecutors' charging decisions are frequently far removed from how Congress intended the mandatory minimums to be used.  *See Dossie*, 851 F. Supp. 2d at 481-84; *Vasquez*, 2010 WL 1257359, at *3–5.  The solution to that problem is for prosecutors to exercise their charging discretion as Congress intended, *see Dossie*, 851 F. Supp. 2d at 485-87, not to adhere to a Guidelines regime that routinely calls for excessive sentences in drug trafficking cases.

admit.[145]  Moreover, Congress has never mandated, directly or indirectly, that the Guidelines for drug trafficking offenses be tied to drug quantity.  The Supreme Court reached that conclusion in *Kimbrough*, rejecting an argument that the Guidelines for crack trafficking offenses had to mimic the 100-to-1 ratio of mandatory minimum sentences for crack and powder cocaine offenses then in effect.[146]  The ADAA, the Court held, "mandates only maximum and minimum sentences," but "says nothing about an appropriate sentence within these brackets."[147]  Accordingly, the Court found that neither the Commission nor sentencing courts were required "to adhere to the 100-to-1 ratio for crack cocaine quantities other than those that trigger the statutory mandatory minimum sentences."[148]  The Commission is similarly at liberty to craft Guidelines ranges that take into consideration factors that more accurately reflect the culpability of drug trafficking offenders.

3.  *The Commission Should Welcome Policy Disagreements as Part of a Critical Dialogue with the Judiciary and Congress About the Guidelines*

The Commission's self-imposed obligation to adhere to the ADAA-driven drug trafficking Guidelines is especially frustrating because it prevents the Commission from engaging in a productive dialogue with the judiciary and Congress.  These policy disagreements are healthy.  The Commission and sentencing judges have different institutional competences and perspectives on sentencing.[149]  The Commission focuses on sentencing at the wholesale level, using data and expert analysis to see the big picture.  Sentencing judges deal with individual cases, and focus on achieving fair and just outcomes one defendant at a time.  Both of

---

[145]     *See* notes 123-25 and accompanying text.
[146]     *See Kimbrough*, 552 U.S. at 102–03.
[147]     *Id*.
[148]     *Id*. at 105.
[149]     *See id*. at 109.

these perspectives are valuable and should be taken into account when formulating sentencing policy.

Sentencing policy would similarly benefit from a dialogue between the Commission and Congress. The Commission is charged with formulating Guidelines on the basis of empirical data and expert analysis. If its "expert judgment reveals that drug sentencing should vary from the legislative mandatory minimums, the legislature may use that information to revise its own approach to sentencing."[150] But under the Commission's current approach, Congress never receives that feedback because the Commission has "accepted and incorporated" the mandatory minimums "wholesale into the guideline structure without the Commission's independent analysis."[151] This ends up "stifl[ing] dialogue between the Commission and the legislature and fails to capitalize on the value of the expert assessments."[152]

Specifically, when the application of a particular offense guideline consistently produces sentences that are so severe that significant numbers of sentencing judges refuse to impose them, the Commission's reaction should naturally be that there is something wrong with the guideline. Federal sentencing judges have been telling the Commission that the drug trafficking offense guideline is defective for years, and not simply by sentencing below the ranges it produces. In 1996 the Federal Judicial Center surveyed Article III judges on their views of the Guidelines.[153] 79% of sentencing judges agreed with the proposition that the "Guidelines should be 'delinked' from the statutory mandatory minimum sentences (*i.e*,. the floors for base offense levels and guideline ranges should be set independently of the mandatory

---

150     *See* Barkow, *supra* note 140, at 1617.
151     *Id*.
152     *Id*.
153     MOLLY TREADWAY JOHNSON & SCOTT A. GILBERT, FEDERAL JUDICIAL CENTER, THE U.S. SENTENCING GUIDELINES: RESULTS OF THE FEDERAL JUDICIAL CENTER'S 1996 SURVEY 12 (1997).

minimums)."[154]  The survey noted that "one of respondents' main concerns with mandatory minimum sentences for drug trafficking, and with guidelines based upon them, is that they are tied to the quantity of drugs involved in a criminal transaction."[155]  Indeed, "[c]ircuit and district judges ranked the use of quantity as a sentencing factor first and second, respectively, as an area requiring substantive change."[156]

In 2007 the Judiciary – in the form of the Criminal Law Committee of the Judicial Conference of the United States – again weighed in on the relationship between mandatory minimum sentences and Guidelines ranges.  In a letter to the Commission, it expressly sought the de-linkage of the Guidelines ranges from mandatory minimum sentences.[157]  "[W]hen the Commission is promulgating base offense levels for guidelines used for offenses with mandatory minimums," the Committee wrote, "the Commission should set the base offense level irrespective of the mandatory minimum term of imprisonment that may be imposed by statute."[158]  While acknowledging that "[w]here mandatory minimum sentences are applicable, they must be imposed," the Committee urged the Commission to make "a system of sentencing guidelines, developed and promulgated by the expert Commission, . . . the foundation of punishment in the federal system."[159]  It concluded that this approach would "avoid injustices that may stem from efforts to engraft meaningful guidelines upon a framework of mandatory minimum sentences."[160]

---

[154]     *Id.*
[155]     *Id.*
[156]     *Id.*
[157]     Letter from the Committee on Criminal Law of the Judicial Conference of the United States to the U.S. Sentencing Comm'n (Mar. 16, 2007), *available at* http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_Meetings/20070320/walton-testimony.pdf.
[158]     *Id.* at 1-2.
[159]     *Id.* at 4.
[160]     *Id.*

Even more recently, the Commission itself solicited the Judiciary's view regarding de-linkage, and we once more reiterated our overwhelming support for it. In response to a 2010 Commission survey, 58% of federal district judges agreed with the proposition that the "guidelines should be 'de-linked' from statutory mandatory minimum sentences (*i.e.*, the guideline ranges should be set by the Commission independently from mandatory minimum sentences);" only 22% disagreed.[161] The Commission has nevertheless continued to ignore the Judiciary's request to unmoor the drug trafficking Guidelines ranges from the ADAA's mandatory minimum sentencing provisions. Indeed, its recent actions suggest a hostility to policy disagreements generally, as last year it asked Congress to pass legislation that would make it easier for appellate courts to snuff those disagreements out.[162]

Finally, the Commission has freighted the debate over variances from the Guidelines – whether in drug trafficking cases or otherwise – with the incendiary suggestion that such variances must be stopped in the name of racial equality. The Commission repeatedly points to a single study, which suggests that judicial variance from the Guidelines in the post-*Booker* period has exacerbated racial disparities in sentencing.[163] This study flies in the face of numerous other studies, which dispute this finding and criticize the Commission's

---

[161] U.S. SENTENCING COMM'N, RESULTS OF SURVEY OF UNITED STATES DISTRICT JUDGES JANUARY 2010 THROUGH MARCH 2010 tbl. 3 (2010).

[162] Saris, *supra* note 73, at 1 ("Congress should enact a more robust appellate review standard that requires appellate courts to apply a presumption of reasonableness to sentences within the properly calculated guidelines range. . . . Congress also should create a heightened standard of review for sentences imposed as a result of a 'policy disagreement' with the guidelines."). In justifying this request, the Chair of the Commission stated that allowing sentencing judges to "substitute their own policy judgments for the collective policy judgments of Congress and the Commission" undermines the Guidelines. *Id.* at 56. This contention might be less hollow if the scenario it suggests – a dialogue between Congress and the Commission producing a "collective judgment" on sentencing policy – actually existed. But there is no such dialogue with respect to the drug trafficking offense guideline. As discussed above, the Commission has slavishly linked drug trafficking sentences to the ADAA's mandatory minimums and it refuses to de-link the two absent congressional action.

[163] U.S. SENTENCING COMM'N, DEMOGRAPHIC DIFFERENCES IN FEDERAL SENTENCING PRACTICES: AN UPDATE OF THE *BOOKER* REPORT'S MULTIVARIATE REGRESSION ANALYSIS (2010).

methodology.[164]  The insidious effect of the Commission's approach is plain.  After the Chair of

the Commission referenced the discredited study in 2011 testimony before the House

Subcommittee on Crime, Terrorism, and Homeland Security,[165]  the Chairman of that

Subcommittee repeated her very words in a plea for a return to more severe sentencing:  "The

increasing frequency of downward departures is undermining sentencing fairness throughout the

federal system. . . .  I would expect my colleagues across the aisle to be deeply concerned with

these developments because they also involve racial disparities, something we hear a lot about in

this committee."[166]

　　　　　Let those who advocate for longer prison terms, and even a return to the dark days

of mandatory Guidelines, go ahead and make their case.  The debate is good for the health of our

federal criminal justice system.  But the suggestion that federal sentences should become more

severe in the name of racial equality is preposterous.  That case has emphatically not been made,

and the Commission's repeated suggestion that it has insults the entire judiciary and demeans the

Commission itself.  If it does nothing else, the Commission should take affirmative steps to

remove the race issue, which it unwisely inserted into the discussion of federal sentencing policy,

from the debate.  It should acknowledge the significant contrary authority set forth in footnote

---

[164]　　*See, e.g.*,  Joshua B. Fischman & Max M. Schanzenbach, *Racial Disparities under the Federal Sentencing Guidelines and Mandatory Minimums*, 9 J. EMPIRICAL LEGAL STUDIES (forthcoming Dec. 2012) (attributing racial disparities in sentencing post-*Booker* to the increased relevance of mandatory minimums rather than increased judicial discretion); M. Marit Rehavi & Sonja B. Starr, *Racial Disparity in Federal Criminal Charging and its Sentencing Consequences*, U. MICH. L. & ECON., EMPIRICAL LEGAL STUDIES CENTER PAPER NO. 12-002 (2012) (attributing, at least partially, racial disparities in sentencing post-*Booker* to prosecutorial charging decisions, particularly the filing of mandatory minimum charges, rather than increased judicial discretion); Jeffrey T. Ulmer et al., *Racial Disparity in the Wake of the* Booker/Fanfan *Decision: An Alternative Analysis to the USSC's 2010 Report*, 10 CRIMINOLOGY & PUB. POL'Y 1077 (2011) (finding that post-*Booker* racial disparity in sentencing was roughly equivalent to pre-*Booker* levels and discussing problematic aspects to the Commission's methodology).
[165]　　Saris, *supra* note 73, at 53-55.
[166]　　F. James Sensenbrenner, Jr., Chairman, Subcommittee on Crime, Terrorism and Homeland Security, U.S. House Judiciary Committee, *Chairman's Statement to the Subcommittee on Crime, Terrorism, and Homeland Security, House Judiciary Committee, October 12, 2011*, 24 FED. SENT'G REP. 335, 338 (2012).

164 above on its website and refrain from making inflammatory suggestions about the intersection of race and sentencing discretion.

CONCLUSION

The Commission should use its resources, knowledge, and expertise to fashion fair sentencing ranges for drug trafficking offenses. If it does, those ranges will be substantially lower than the ranges produced by the current offense guideline. The deep, easily traceable structural flaw in the current drug trafficking offense guideline produces advisory ranges that are greater than necessary to comply with the purposes of sentencing. We must never lose sight of the fact that real people are at the receiving end of these sentences. Incarceration is often necessary, but the unnecessarily punitive extra months and years the drug trafficking offense guideline advises us to dish out matter: children grow up; loved ones drift away; employment opportunities fade; parents die.

Until the Commission does the job right, which should take considerable time, it should lower the ranges in drug trafficking cases by a third for the reasons set forth above. In the meantime, the current ranges will be given very little weight by this Court.


John Gleeson, U.S.D.J.


Dated: January 28, 2013
        Brooklyn, New York