UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    V.                                       11 Cr 821 (JG)

YSIDRO DIAZ

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## SENTENCING MEMORANDUM ON BEHALF
## OF DEFENDANT YSIDRO DIAZ

JOYCE C. LONDON, P.C.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 964-3700

*ATTORNEY FOR DEFENDANT*
*YSIDRO DIAZ*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    V.                                                                   11 Cr 821 (JG)

YSIDRO DIAZ

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT YSIDRO DIAZ**

      This Sentencing Memorandum is respectfully submitted on behalf of defendant Ysidro Diaz whose sentencing is scheduled for March 8, 2013.

**I.    INTRODUCTION**

      On May 18, 2012, Ysidro Diaz entered a plea of guilty to a single count indictment which charged him with conspiring to distribute and possess with intent to distribute one kilogram and more of heroin and cocaine in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(I) and 841 (b)(1)©.

    Mr Diaz is a young man, born in the Dominican Republic who has achieved some remarkable accomplishments in his young life.  He is well educated.  He performed several years of military service in the Dominican Navy and was honorably discharged with the rank of corporal.  Throughout his life, he has excelled athletically, representing his university, the military, and his country at various sports throughout Latin America.  Equally importantly, he has served as a much beloved role model in his Dominican community.

    Significantly, as will be detailed, *infra*, this offense was created and orchestrated by a

2

confidential informant ("CI") and his handling agent and only came to fruition after several weeks of "hounding" by the CI. Mr. Diaz has accepted full responsibility for his participation in this offense and has expressed his sincere remorse.

In the context of Mr. Diaz' life, this offense constitutes an aberrant and unfortunate episode in an otherwise credit-worthy life.

## II.  THE PRE-SENTENCE REPORT

### 1. The Guidelines Calculations

According to the guideline calculations in the Pre-Sentence Report ("PSR"), Mr. Diaz has a total adjusted offense level of 27[1] and is in criminal history category I. This correlates with an advisory guideline sentencing range of 70 to 87 months imprisonment.

### 2. Objections to the PSR

Factual objections to the PSR were submitted to the Probation Department by letter dated September 20, 2012 and are satisfactorily addressed in the Probation Department's Addendum to the PSR.

Mr. Diaz, however, has a legal objection to the PSR in that he is not accorded a two-level minor role adjustment. See PSR ¶¶ 10 and 18. It is respectfully submitted that a minor role adjustment pursuant to Guideline § 3B1.2(b) is warranted.

#### A.  Mr. Diaz Should Receive a Minor Role Adjustment

a.  Applicable Law

Guideline section 3B1.2(b) provides that a defendant's base offense level may be

---

[1] This total offense level includes a two-level safety-valve reduction. Both the Probation Department and the Government concur that the defendant has satisfied the requisite statutory and guidelines criteria. See PSR ¶ 16.

decreased by two levels "if the defendant was a minor participant in any criminal activity." U.S.S.G. section 3B1.2(b).  Application Note 5 states that this subsection "applies to a defendant. . . who is less culpable than most other participants, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2, n.5.  The commentary further specifies that the adjustment "involves a determination that is heavily dependent upon the facts of the particular case."  Id., n.3©.

To obtain a sentence reduction as a minor participant, the defendant must prove his reduced culpability by a preponderance of the evidence.  United States v. Yu, 285 F.3d 192, 200 (2d Cir. 2000); United States v. LaValley, 999 F.3d 663, 665 (2d Cir. 1993); United States v. Shonubi, 998 F.2d 84 (2d Cir. 1993).   It is well established that a sentencing court's assessment of the defendant's role in criminal activity is highly fact-specific and depends upon "the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise."  United States v. Carpenter, 252 F.3d 230, 234 (2d Cir. 2001), quoting United States v. Shonubi, supra, 998 F.2d at 90; United States v. Garcia, 920 F.2d 153, 155 (2d Cir. 1990) (per curiam).  A minor role reduction "will not be available simply because the defendant played a lesser role than his co-conspirators; to be eligible for a reduction, the defendant's conduct must be minor as compared to the average participant in such a crime."  United States v. Rahman, 189 F.3d 88, 159 (2d Cir. 1999)(fn.1).

I.   Nature of Mr Diaz' Relationship to the Other Participants.

The PSR notes that the instant investigation, undertaken by the Homeland Security Investigations and Border Enforcement Security Task Force began in September 2011.  See PSR

¶ 3. Mr. Diaz' relationship with the confidential informant ("CI"), however, began several years earlier as it was the CI who arranged for Mr. Diaz to enter the United States illegally and provided him with false documentation under Mr. Diaz' true name when he arrived here. Additionally, the CI repeatedly urged Mr. Diaz to obtain identification documentation in a false name, build up the credit under that name in order to obtain a loan under the false name. Mr. Diaz always declined to do so.

Several weeks before the official investigation began, the CI began "hounding" Mr. Diaz to introduce him to any contacts who could provide him with heroin as he believed that Mr. Diaz, who worked as a barber, knew about the availability of drugs through the conversations of some of his customers. He made repeated phone calls to Mr. Diaz and he visited him at the barber shop - all to press his demand that Mr. Diaz put him in contact with individuals who might be able to supply him with heroin. When the CI was unable to reach Mr. Diaz by phone or see him at the barber shop, he called Mr. Diaz' girlfriend in Pennsylvania to tell her that it was urgent that she tell her Mr. Diaz to contact him. He even traveled to Pennsylvania to Mr. Diaz's girlfriend's residence to further his cause. Mr Diaz repeatedly refused.

However, by late summer 2011, Mr. Diaz was under considerable financial pressure. He had ongoing pressure to repay to family and friends the $26,000 he had been given in personal loans to start up a restaurant in Queens[2] and the additional pressure of having to pay school fees for his children's tuition in the Dominican Republic as it was the start of a new school year. As a result of these pressures, Mr Diaz agreed to assist the CI by finding an individual or individuals

---

[2]     Unfortunately, the restaurant had to be sold several months earlier because it was failing economically.

who could provide the CI with heroin.[3]

Thus, Mr. Diaz contacted co-defendant Manuel Santos whom he had known for about a year and who was one of his customers at the barbershop.  Mr Santos informed him that he could obtain approximately two kilograms of heroin for him.  Mr. Diaz then introduced the CI to Manuel Santos.  Mr. Santos then provided Mr Diaz with a heroin sample to give to the CI.  This was approved by the CI who then made arrangements directly with Mr. Santos for the delivery of the heroin.  The CI also asked Mr. Diaz for 500 grams of cocaine which Mr. Diaz was able to obtain for him through a different contact.

      ii.      <u>Importance of Mr Diaz' Actions to the Success of the Venture.</u>

Although it can be argued that in every conspiracy, each co-conspirator's actions, no matter how minimal, contribute to the success of the venture, it is clear that some co-conspirators' actions are more essential than others.  Such is the situation of Mr Diaz.  Here Mr. Diaz was targeted not because he was a known drug dealer, but rather because he knew various individuals involved in narcotics dealing through his legitimate employment as a barber. Clearly, he provided assistance by acting as a broker for the CI, but this assistance came after weeks of telling the CI that he was not interested in assisting him.

The PSR asserts that Mr Santos received a minor role adjustment because he merely transported the drugs and did not broker any deals."  Addendum to PSR, ¶¶ 12 and 18.  Mr. Santos, however, did more than merely transport the drugs.  Santos himself obtained the heroin in question from one of his own contacts.  Mr. Diaz had no dealings with this contact and played

---

       [3]      As is generally the rule in CI/case agent-driven narcotics transactions, the drug quantity was set by the government and its agents so as to fall into the highest possible mandatory minimum sentencing category.

no role in either the negotiations for or the delivery of the heroin. In fact, the arrangements were that Mr. Santos would pick up the heroin from his supplier and deliver it directly to the CI, by-passing Mr. Diaz although Mr. Diaz was aware that the delivery was occurring. The fact that the handover was to take place outside the residence of Mr. Diaz' girlfriend in Brooklyn was orchestrated by the government and the CI. With respect to the 500 grams of cocaine, these drugs were supplied by another contact of Mr. Diaz' who was able to obtain the 500 grams. Mr. Diaz simply picked up the cocaine and delivered it to the CI.

      iii.      Mr. Diaz' Knowledge of the Nature and Scope of the Criminal Activity.

Mr. Diaz did not know the individual who was the actual supplier of the heroin in question. Nor did he know to whom the CI intended to sell the drugs. His role was purely that of a broker/middleman and courier. He had no proprietary interest in the drugs. Thus, his knowledge of the scope of the criminal activity is limited.

As the Second Circuit has stated, "[i]t is not the defendant's exact role or status in the criminal activity that necessarily decides this question; rather, it is an assessment of the defendant's culpability in the context of all the circumstances." United States v. Shonubi, supra, 998 F.2d at 90 citing United States v. Garcia, supra, 920 F.2d at 155; see also United States v. Lopez, 937 F.2d 716, 727 (2d Cir. 1991).

Accordingly, it is respectfully submitted that in the context of all the circumstances of this case, Mr. Diaz should be characterized as a minor participant and his guideline adjusted offense level should be reduced by two levels.

**III.    AN EXAMINATION OF THE 18 U.S.C. § 3553(a) FACTORS MAKE CLEAR THAT A NON-GUIDELINES SENTENCE IS APPROPRIATE**

In imposing sentence, this Court must consider the factors set forth in 18 U.S.C. § 3553(a), which include:

(1)   the nature of and circumstances of the offense and the history and characteristics of the defendant;
(2)   the need for the sentence imposed –
    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B)   to afford adequate deterrence to criminal conduct;
    ©    to protect the public from further crimes of the defendant; and
    (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)   the kinds of sentences available;
(4)   the advisory Guidelines range;
(5)   any pertinent policy statements issued by the Sentencing Commission;
(6)   the need to avoid unwarranted sentence disparities; and
(7)   the need to provide restitution to any victims of the offense.

*Id.* After considering all of those factors, this Court must "impose a sentence sufficient, *but not greater than necessary*, to comply with the purposes set forth in paragraph (2)." *Id.* (Emphasis added).

### 1. The Nature and Circumstances of the Offense

As noted *supra*, the instant offense was initiated, managed and directed by a CI and his agent/handler. How Mr. Diaz became involved in the offense conduct is also set forth *supra*. See II, (2)(A).

It is also important to note that the type of drug was chosen by the government and the quantity of drugs was similarly dictated by the government - obviously a drug weight chosen with a statutory mandatory minimum sentence in mind. Also significant, is the fact that the heroin in question was a "sham" substance, and not, in fact, heroin.

### 2. The History and Characteristics of the Defendant

As detailed in the PSR, Mr. Diaz was born and raised in the Dominican Republic in an

intact and caring family. His close ties with his family are clear from the many letters written on his behalf from family members. These letters together with English translations are attached hereto as Exhibit A.[4] He is described by all as a loving, hard-working, caring, law-abiding young man who has made his entire family very proud of him. He has also actively encouraged his nieces and nephews to be law-abiding, well-educated and productive citizens as is evidenced in their letters to the Court..

In school, he did well academically and had almost completed a degree in accounting before deciding to come to live in the United States in search of greater opportunities to better provide for his family. A Certification letter from the Vice-Rector of the La Vega Campus of the Nation University Pedro Henriquez Urena confirms his completion of the third quarter towards an accounting and auditing degree and is attached hereto with an English translation as Exhibit B.

Most notably, throughout his life, Mr. Diaz has excelled athletically. While in the Navy, he represented the Navy in track and field events, competing for the team both within the Dominican Republic and throughout Latin America. He represented his province with distinction in track and field events for many years and was also chosen to be a member of the Dominican track and field team representing his country at the Pan American games in 2003. Letters attesting to these achievements, together with English translations, are attached hereto as Exhibit C. Additionally, he played semi-professional baseball for various provincial teams in the Dominican Republic in the early 1990's.

A letter from the local community board where Mr. Diaz resided for most of his life and where his family continues to reside evidences the high regard in which he is held by this

---

[4] English translations of letters written in Spanish are also included as Exhibit A.

community. This letter has been signed by every member of the Board as well as many members of the community. This letter together with an English translation is attached hereto as Exhibit D. Also included in Exhibit D are other letters from friends, neighbors in the Dominican Republic and members of the local community. All hold Mr. Diaz in the highest regard and cite him as an exemplary citizen and role model to the youth of this community.

      As set forth in the PSR, Mr Diaz has either been a student, in the military or working for his entire life. Soon after his retirement from the "glory days" of athletics, he made the decision to come to the United States to seek better employment opportunities. Two of his siblings were here already and had established meaningful productive lives. He already had skills as a barber so was immediately employable. He also obtained additional work at a restaurant in Queens and several years later bought the restaurant, financed in part with loans from family and friends. The business was not a success and within a year, Mr. Diaz was forced to sell the restaurant. The buyer assumed all of the outstanding debt incurred by the restaurant with the exception of the $26,000 personal loans Mr. Diaz had borrowed. Trying to repay this debt became the ball and chain around Mr. Diaz' neck and was the underlying cause for his involvement in the instant offense. However, given his history of achievements, his willingness to work hard and excel at whatever he undertakes, his remorse and shame for his involvement in this case as expressed in his letter to the Court dated November 23, 2012 and his desire to recapture the pride and respect of his family and community, he has a bright future ahead of him.

    3.    **The Remaining Factors of 18 U.S.C. §3553(a)**

      As set forth above, the so-called "parsimony clause" of 18 U.S.C. §3553(a) requires this Court to impose a sentence which is "sufficient, but not greater than necessary" to satisfy the

factors set forth in 18 U.S.C. §3553(a)(2). If this Court were to "conclude that two sentences equally served the statutory purpose of §3553, it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

    a.    Individual Deterrence

With regard to the need to protect society from future crimes of this defendant, this case has proven to be a long, painful and embarrassing lesson for Mr. Diaz. He has had endless hours to contemplate the poor decisions that he made to find himself in this situation. Thus, he is unlikely ever to find himself again facing criminal charges. Since he entered the United States illegally, he faces deportation to the Dominican Republic upon his release from custody. There he has an extended family and community ready, willing and able to help him find work and support him until he does.

    b.    General Deterrence

In this case, Congress has sent a message of general deterrence by setting a mandatory minimum sentence of ten years for the crime to which Mr. Diaz has pled guilty. Without the benefit of the safety valve provisions set forth in 18 U.S.C. 3553(f)(1)-(5) and Guideline §5C1.3(a)(1)-(5), Mr. Diaz would be unable to obtain any relief from this harsh mandatory minimum sentence. Congress' general deterrence provision is more than sufficient to meet this goal of sentencing.

    c..    Need for Educational or Vocational Training and Medical
               or Substance Abuse Treatment

Mr. Diaz does not need to be incarcerated to receive vocational or educational training. He is a well-educated young man with professional skills and resources. Similarly, he

does not need to be incarcerated to receive medical or substance abuse treatment.

Significantly, the PSR notes no history of substance abuse and his alcohol consumption is best described as minimal - information which is corroborated by his brother.  See PSR ¶ 42

## IV.     A REASONABLE SENTENCE

Given all the facts and circumstances of this case, as detailed herein and in the PSR, a sentence below the recommended advisory guideline sentencing range of 70 to 87 months and below the one third guideline reduction which the Court has stated that it intends to adopt, see Memorandum Explaining Policy Agreement with the Drug Trafficking Offense Guideline dated January 28, would constitute a reasonable sentence for Ysidro Diaz.

In light of the following factors:

- Mr. Diaz' complete acceptance of responsibility for his actions;
- his genuine remorse for his actions;
- his lack of any prior criminal convictions;
- his consistent employment both since his arrival in the United States, and prior thereto;
- his record of military service in the Navy of the Dominican Republic;
- his athletic contributions for his country;
- the fact that this offense was initiated by the government and the drug quantity in question was set by the government; and
- the circumstances surrounding and subsequent to Mr. Diaz' safety-valve proffer,[5]

it is respectfully submitted that a sentence of 24 months or less would constitute a just and reasonable sentence and not greater than necessary for Mr. Diaz.

## V.     CONCLUSION

For all of the reasons set forth above, it is respectfully submitted that a sentence of 24 months or less would be a reasonable sentence for defendant Ysidro Diaz.

---

[5]     The circumstances relating to Mr. Diaz' safety-valve proffer are set forth in a separate letter to the Court.

Dated: New York, New York
　　　　February 28, 2012

　　　　　　　　　　　　　　　　　　　　　Respectfully submitted,
　　　　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　　　　JOYCE C. LONDON, P.C.
　　　　　　　　　　　　　　　　　　　　　20 Vesey Street, Suite 400
　　　　　　　　　　　　　　　　　　　　　New York, New York 10007
　　　　　　　　　　　　　　　　　　　　　(212) 964-3700

　　　　　　　　　　　　　　　　　　　　　*ATTORNEY FOR DEFENDANT*
　　　　　　　　　　　　　　　　　　　　　*YSIDRO DIAZ*