

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

SLT:BGK
F.#2009R01819

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

April 10, 2013

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

> Re:  United States v. Ysidro Diaz
>      Criminal Docket No. 11-821 (JG)

Dear Judge Gleeson:

The government respectfully submits this letter in response to defendant Ysidro Diaz's sentencing memorandum, dated March 27, 2013, requesting a sentence below the applicable United States Sentencing Guidelines ("Guidelines") range based on factors set forth in 18 U.S.C. § 3553(a).  For the reasons stated below, the government submits that a Guidelines sentence is warranted.

I.   Background: Offense Conduct

In September 2011, Department of Homeland Security, Homeland Security Investigations ("HSI") agents received information from a cooperating witness (the "CW") that an individual he knew as "Isidro Diaz" was interested in selling the CW two kilograms of heroin.  In September 2011, during a meeting with the CW, an individual later identified as the defendant provided the CW with a sample of heroin and agreed to sell the CW a total of two kilograms of heroin.  The CW gave that sample to HSI agents which field tested positive for heroin.

Based upon that information, at the instruction and under the observation of HSI agents, the CW made recorded telephone calls to Diaz on or about September 20, 2011 and September 26, 2011.  During these calls, in substance and in part, DIAZ agreed to sell two kilograms of heroin to the CW for $64,000 per kilogram.

2

On or about October 28, 2011, at the instruction and under the observation of HSI agents, the CW made another recorded telephone call to Diaz. During this call, in substance and in part, Diaz reiterated his agreement to sell two kilograms of heroin to the CW for $64,000 per kilogram. In addition, Diaz agreed to sell 500 grams of cocaine to the CW for approximately $33 to $36 per gram.

Later that day, the CW met with defendant Diaz at Diaz's girlfriend's residence in Brooklyn, New York. The CW attended this meeting with an HSI confidential source (the "CS"). During the course of the meeting, Diaz informed the CW that another individual would be arriving with the heroin in a couple of hours. Diaz then instructed the CW to stay in Diaz's girlfriend's apartment and wait for the arrival of a male individual with the heroin. Diaz informed the CW that he had to leave to get the 500 grams of cocaine, but would be back shortly. Thereafter, Diaz, along with a minor child who he was watching, left the location in a livery cab to obtain the cocaine.

Approximately two hours later, HSI agents observed co-defendant Manuel Santos arriving at Diaz's girlfriend's residence. At that time, Santos was carrying a grey messenger bag. Santos gave this bag to the CS, who was waiting in an automobile outside Diaz's girlfriend's residence. The CW asked Santos how much was in the bag, and Santos responded "1300."

Approximately 15 minutes after Santos arrived, Diaz, along with the minor child, returned by cab. At that time, Diaz immediately proceeded to the CS's vehicle and provided the CS with a package containing a white powdery substance. HSI agents then placed Santos and the defendant under arrest and seized over 1000 grams of what appeared to be heroin from the grey messenger bag, and over 200 grams cocaine from the package.

Following his arrest, Santos waived his <u>Miranda</u> rights and agreed to make a statement. In sum and substance, Santos stated that this was his fourth time acting as a drug transporter and that he was bringing the drugs to Diaz. Santos further stated that he contacted Diaz by telephone twice before bringing the drugs to the address Diaz provided him.

On May 18, 2012, the defendant pleaded guilty to
conspiracy to distribute and possession intent to distribute one
kilogram or more of heroin and a substance containing cocaine, in
violation of Title 21, United States Code, Sections 846,
841(a)(1), 841(b)(1)(A)(1) and 841(b)(1)(C).

## II.   The Probation Department's Guidelines Analysis is Correct

The Presentence Investigation Report ("PSR") indicates
that under the Guidelines, the defendant has a total adjusted
offense level of 27 and a Criminal History Category of I, with a
corresponding range of imprisonment of 70 to 87 months. (PSR ¶¶
11, 15-27, 53).  As noted in the PSR, the defendant is eligible
for "safety value" relief from the applicability of the statutory
minimum sentence. (PSR ¶ 16). The government agrees with the
Probation Department's Guidelines analysis.

### A.   A Minor Role Adjustment Is Not Warranted

The defendant contends that he should receive a two
point downward adjustment for minor role under U.S.S.G. §
3B1.2(b). The defendant argues, in part, that his role in this
conspiracy was similar that of co-defendant Santos.  This
argument is without merit.

A defendant is eligible for a two-level reduction under
Guidelines Section § 3B1.2(b) if he was a "minor participant,"
defined in the commentary as a defendant "who is less culpable
than most other participants, but whose role could not be
described as minimal." U.S.S.G. § 3B1.2 App. Note 5.  A
mitigating role adjustment under § 3B1.2 is appropriate only when
a defendant is "substantially less culpable than the average
participant," U.S.S.G. § 3B1.2 App. App. Note 3A.

In order to receive an adjustment for minor role, a
defendant must prove by a preponderance of the evidence that he
is entitled to the mitigating role adjustment under Guidelines
Section 3B1.2. United States v. Yu, 285 F.3d 192, 200 (2d Cir.
2002); United States v. Castano, 234 F.3d 111, 113 (2d Cir.
2000); United States v. Colon, 220 F.3d 48, 51 (2d Cir. 2000).
The analysis of a defendant's role in criminal activity is
"'highly fact-specific and depends upon the nature of the
defendant's relationship to other participants, the importance of
the defendant's actions to the success of the venture, and the
defendant's awareness of the nature and scope of the criminal
enterprise.'" United States v. Carpenter, 252 F.3d 230, 234 (2d
Cir. 2001) (quoting United States v. Shonubi, 998 F.2d 84, 90 (2d
Cir. 1993)).  Moreover, a "sentencing court is not bound to

4

accept [a] defendant's self-serving characterizations of his role in an offense." <u>Shonubi</u>, 998 F.2d at 90.

Not surprisingly, the Second Circuit and other Courts have routinely upheld the denial of mitigating role adjustments, even with respect to defendants who acted merely as brokers or couriers of relatively modest quantities of narcotics, so long as the defendant's role in the illegal venture was important to its success. <u>See</u>, <u>e.g.</u>, <u>United States v. Imtiaz</u>, 81 F.3d 262, 265 (2d Cir. 1996) (<u>per</u> <u>curiam</u>) (affirming denial of mitigating role adjustment to broker/courier in single, two-kilogram heroin transaction); <u>United States v. Garcia</u>, 920 F.2d 153, 154-55 (2d Cir. 1990) (upholding denial of minor role adjustment to courier who received $150 for single delivery of one kilogram of cocaine; recognizing that couriers "are indispensable to the smuggling and delivery of drugs and their proceeds"); <u>see</u> <u>also</u> <u>United States v. Cantrell</u>, 433 F.3d 1269, 1282-84 (9th Cir. 2006) (finding that "drug courier and facilitator" responsible for between 1.5 and 5 kilograms of methamphetamine was properly denied minor role adjustment); <u>United States v. Gonzalez-Soberal</u>, 109 F.3d 64, 74 (1st Cir. 1997) ("even assuming, arguendo, that appellant was able to establish that he was merely a courier, he has failed to carry his burden of showing that he is entitled to a downward adjustment").

Here, the defendant played a significant role in the narcotics conspiracy. The defendant: (1) obtained and delivered a sample of heroin to CW in September 2011; (2) negotiated with the CW and arranged for the sale of more than a kilogram of heroin, and (3) negotiated and delivered to the CW over 200 grams of cocaine. Unlike Santos, whose role was limited to just delivering narcotics, Diaz's actions make clear that he not only played a more significant role in the narcotics transactions than Santos, but that his conduct was vital to the success of the narcotics transactions. Notably, Diaz, in addition to negotiating the drug transactions, had the contacts with drug suppliers, both the cocaine and heroin suppliers. Without Diaz's relationships with these narcotics suppliers, the drugs would not have been obtained. It follows, therefore, that without Diaz, the narcotics transactions would not have taken place. As a result, a minor role downward adjustment is not warranted.

## III. A Guidelines Sentence is Appropriate for Diaz

The Court should sentence the defendant within the applicable advisory Guidelines range of 70 to 87 months' imprisonment.

5

A.   <u>Legal Standard</u>

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007) (citation omitted).  "Even after <u>Gall</u> and <u>Kimbrough v. United States</u> [552 U.S. 85 (2007)], sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a body of casual advice."  <u>United States v. Cavera</u>, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (internal quotation marks omitted). Next, a sentencing judge should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  <u>Gall</u>, 552 U.S. at 49-50 (citation and footnote omitted).  "When a factor is already included in the calculation of the guidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the guidelines calculation." <u>United States v. Sindima</u>, 488 F.3d 81, 87 (2d Cir. 2007).  When a district court imposes a sentence outside the recommended Guideline range, it "'must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'"  <u>Cavera</u>, 550 F.3d at 189 (quoting <u>Gall</u>, 552 U.S. at 50).

In considering a sentence, the Court must also consider factors in Title 18, United States Code, Section 3553(a), which include:

> (1) the nature and circumstances of the offense;
> (2) the seriousness of the offense;
> (3) punishment;
> (4) deterrence;
> (5) the need to protect the public from further crimes of the defendant; and
> (6) to provide the defendant with needed educational or vocational training; medical care, or other corrections treatment in the most effective manner.

These factors call for a Guidelines sentence.

6

B.    The Nature and Circumstance of the Offense

        The crime committed by the defendant was serious.
The defendant, after having entered this country illegally, chose
to conspire to distribute both cocaine and heroin.  During the
drug transaction, the defendant endangered the well-being and
safety of a child by both bringing this child with him to his
cocaine supplier, and bringing this child with him to deliver the
drugs.

        The defendant also made a series of conscious
decisions with respect to the crime.  This was not a spur-of-the-
moment decision. The planning and commission of this crime took
place over the course of several weeks.  The defendant had more
than enough time to consider whether or not to participate in the
unlawful activity.  Further, although this may have been the
first time the defendant was arrested for a narcotics offense,
this was not the defendant's first narcotics offense.  The
defendant previously obtained 100 grams of heroin for the CW in
2009.  In addition, prior to the defendant's arrest in 2011, the
defendant attempted a heroin transaction.  Therefore, his actions
do not constitute "an aberrant and unfortunate episode in an
otherwise credit-worthy life." Def.'s Memo at 3.

        Based upon the nature and circumstance of this crime, a
Guidelines sentence is warranted.

C.    The Need for the Sentence Imposed

        The defendant argues that this Court should impose a
below-Guidelines sentence based on factors set forth in 18 U.S.C.
§ 3553(a) and, in part, on the reasoning in Your Honor's
Memorandum Decision in this case, dated January 21, 2013.  As set
forth below, the government respectfully disagrees with the
Court's conclusion that the 1986 Anti-Drug Abuse Act (the "1986
Act") was intended to target only "managers and leaders" and
"kingpins" of narcotics organizations and that the Guidelines are
inconsistent with the true purpose of the 1986 Act.  As discussed
in more detail below, the government also respectfully submits
that courts' experience with the narcotics trafficking Guidelines
demonstrate that courts typically find that Guidelines sentences
in drug cases are within the "heartland" of narcotics sentences.
For the reasons set forth below, the government respectfully
requests that the Court impose a Guidelines sentence in this
case.

1. <u>The Relationship Between Drug Quantity and Punishment</u>

In the 1986 Act, Congress imposed mandatory minimum penalties linking punishment to drug quantity for all narcotics trafficking offenders, not just "kingpins" or "managers and leaders" of drug organizations.  The relationship between drug quantity and punishment is clear from the plain language of the statute and, as a matter of statutory interpretation, there is therefore no need to turn to the legislative history to discern Congress's intent.  <u>See</u> <u>United States v. Salim</u>, 549 F.3d 67, 78 (2d Cir. 2008) ("'[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.'" (<u>citing</u> <u>Conn. Nat'l Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992)); <u>see also</u> <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 457 (2002) ("Floor statements from two Senators cannot amend the clear and unambiguous language of a statute.  We see no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text.").

This understanding of the mandatory minimum provisions finds further support in Congress's 1986 revisions to the Continuing Criminal Enterprise ("CCE") statute, originally enacted in 1970.  In the 1986 CCE amendments, Congress imposed a mandatory term of life imprisonment on

> [a]ny person who engages in a continuing criminal enterprise . . . if . . . (1) such person is the <u>principal administrator, organizer, or leader of the enterprise or is one of several such principal administrators, organizers or leaders</u>; and (2)(A) the violation [of Title 21] involved at least 300 times the quantity of a substance described in subsection 401(b)(1)(B) [codified at 21 U.S.C. § 841(b)(1)(B)] of this Act, or (B) the enterprise, or any other enterprise in which the defendant was the <u>principal or one of several principals administrators, organizers, or leaders</u>, received $10 million dollars in gross receipts during any twelve-month period of its existence for the manufacture, importation, or distribution of a substance described in 401(b)(1)(B) [codified at 21 U.S.C. § 841(b)(1)(B)] of this Act.

Pub. L. No. 99-570, § 1253, 100 Stat. 3207-14-15 (1986) (emphasis added).  These amendments to the CCE statute - enacted at the

same time Congress instituted the mandatory minimum penalties in
21 U.S.C. §§ 841 and 960 - provide reassurance that, when
Congress intends to target role, it does so expressly.[1]   Cf.
Russello v. United States, 464 U.S. 16, 23 (1983) (noting that if
Congress had intended the statutory construction urged, Congress
would have drafted the statute to reflect that intent "expressly
as it did in the immediately following subsection" of the act);
see also Dir. of Revenue of Mo. v. CoBank ACB, 531 U.S. 316, 325
(2001) ("Had Congress intended [the construction urged], it would
have done so expressly as it had done elsewhere in the . . .
Act.").  The CCE amendments also demonstrate that, in 1986,
Congress could envision a narcotics organization capable of
earning $10 million in a year and dealing in 300 times the
quantity of narcotics that would result in a ten-year mandatory
minimum under § 841.  At the time of the 1986 Act, in other
words, Congress as a whole understood that the quantities set
forth in § 841 and § 960 did not make a "kingpin."[2]

---

[1]     The original 1970 CCE statute provided a punishment of
10 years to life for "[a]ny person who engage[d] in a continuing
criminal enterprise," and explained that a person was "engaged in
a continuing criminal enterprise if" he committed certain
violations of Title 21 "in concert with five or more other
persons with respect to whom such person occupies a position of
organizer, a supervisory position, or any other position of
management, and . . . from which such person obtains substantial
income or resources."  Pub. L. No. 91-513, Title II, § 408, 84
Stat. 1265 (1970) (codified at 21 U.S.C. § 848).

[2]     The CCE statute was popularly known as the "kingpin"
statute at the time of the 1986 Act.  See, e.g., Aric Press, The
Return of the French Connection, Newsweek, April 13, 1987, at 56
("[T]he jury convicted both Beneventos under the special federal
drug-kingpin statute.  That strict law applies only to defendants
found to have managed a series of drug deals."); Contra Supplier
Pleads Guilty, The Washington Post, January 27, 1987, at A4 ("He
pleaded guilty to three counts - including operating a continuing
criminal enterprise - under the so-called 'drug kingpin statute'
that carries a mandatory 10-year prison term."); 7 Convicted in
Coke-Ring Case, The Miami Herald, December 19, 1986, at 3. ("Two
Miami men . . . were convicted under the federal 'kingpin'
statute for managing a continuing criminal enterprise.").

        During debate on the 1986 Act, the floor statements of
some senators make clear that when they were referring to new
laws targeting "major drug traffickers" and "kingpins," they were
referring to the 1986 Amendments to the CCE statute, not to the

9

Congress revisited the 1986 Act's mandatory minimum provisions §§ 841 and 960 in 1994 and again in 2010.  In both bills, Congress sought to limit application of the 1986 mandatory minimums to certain less culpable defendants, while reinforcing their application to all other defendants irrespective of a defendant's role in a narcotics organization.

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act, Pub. L. No. 103 322, 108 Stat. 1796 (the "1994 Act").  The 1994 Act retained the overall structure of five- and ten-year mandatory minimums from the 1986 Act, but placed a "limitation on [the] applicability of mandatory minimum penalties in certain cases." Pub. L. No. 103 322, Title VIII, § 80001.  Specifically, Congress created the "safety valve" provision codified in Title 18, United States Code, § 3553(f) as an exemption for a "narrow class of defendants" viewed by Congress as "the least culpable participants" in drug trafficking offenses.  H.R. Rep. 103-460 (1994).  The House Report that accompanied the 1994 Act explained that the "safety valve" provision would

> increase the effectiveness of existing controlled
> substance mandatory minimums by insuring that
> these penalties are directly targeted towards
> relatively more serious conduct.  This, in turn,
> will send a clear signal about what conduct
> related to drug trafficking Congress considers
> most serious.  At the same time stiff, crime-
> deterring penalties for all defendants convicted
> of controlled substance offenses will be
> preserved.

Id. (emphasis added).  The Commission then "promulgate[d] Guidelines, or amendments to Guidelines, to carry out the purposes of this section and the amendment made by this section" as instructed by Congress.  Id. § 80001(b)(1)(i); see also U.S.S.G. §§ 2D1.1(16), 5C1.2.

---

mandatory minimums for importation and possession with intent to distribute under §§ 841 and 960.  See, e.g. 132 Cong. Rec. 27,178 (Sept. 30, 1986) (statement of Sen. Tribble) (noting that he authored a proposal in the bill that "provides for life imprisonment without parole for major drug traffickers"); 132 Cong. Rec. 27,179 (statement of Sen. Chafee) (noting that the bill "sets a term of life imprisonment in certain circumstances, for drug kingpins").

At the same time Congress enacted the safety valve provision, it reiterated the seriousness with which it approached even the "least culpable participants" in drug trafficking offenses.[3]  In the 1994 Act, Congress instructed that defendants who qualify for safety valve relief should nevertheless be subject to a Guidelines sentence of at least 24 months.  See Pub. L. No. 103-322, Title VIII, § 80001(b) (providing that defendant who is eligible for safety valve but "for whom the statutorily required minimum sentence is 5 years, such guidelines and amendments to guidelines issued under subparagraph (A) shall call for a guideline range in which the lowest term of imprisonment is at least 24 months").[4]  This provision reflects Congress's view that even the "least culpable" offenders should be subject to a significant term of incarceration if they were responsible for a quantity of drugs that would otherwise trigger a mandatory minimum sentence.

---

[3]  In Fiscal Year 2010, "[a]lmost half [42.9%] of the powder cocaine offenders [convicted of a statute carrying a mandatory minimum penalty] received relief through operation of the safety valve."  See Mandatory Minimum Report 178 & Table 8-5.  This was true of 42.4% of similarly situated heroin offenders (see id. at 240 & Table 8-16), and 11.6% of similarly situated crack cocaine offenders (see id. at 193 & Table 8-8).

[3]  In § 3553(e) and (f), Congress has created exclusions to the 1986 mandatory minimums that relieve anywhere from a third to almost two-thirds of offenders from application of the mandatory minimum penalties.  In Fiscal Year 2010, as a result of those two forms of relief, 61.4% of powder cocaine offenders subject to a mandatory minimum were relieved of that penalty (see id. at 179 & Fig. 8-14), along with 56.3% of similarly situated heroin offenders (see id. at 243 & Fig. 8-44), and 36.0% of crack offenders (see id. at 195 & Fig. 8-21).

[4]  This aspect of the 1994 law is currently reflected in U.S.S.G. § 5C1.2(b), which provides that, in the case of a defendant who qualifies for the safety valve and "for whom the statutorily required minimum sentence is at least five years, the offense level . . . shall be not less than level 17 [with a corresponding Guidelines range of 24-30 months' imprisonment, assuming a Criminal History Category of I]." U.S.S.G. § 5C1.2(b); see also U.S.S.G. App. C Vol. II amend. 624 (2001 U.S.S.G. amendment enacting § 5C1.2(b) in response to Congress' 1994 instruction).

11

In the 2010 Fairness in Sentencing Act (the "2010 Act"), Congress again legislated against the background of the 1986 mandatory minimums, and again reaffirmed the link between punishment and drug quantity.  See Pub L. No. 111-220, 124 Stat 2372.  In the 2010 Act, Congress revised the mandatory minimums applicable to crack cocaine offenses to bring them closer to parity with those for powder cocaine.  See id. § 2.  In so doing, Congress eliminated the mandatory minimum sentence for simple possession of crack cocaine and increased the amount of crack necessary to trigger a mandatory minimum sentence under Title 21, United States Code, §§ 841 or 960, but it did not alter the overall structure of the five- and ten-year mandatory minimums. See id. § 3.  Indeed, in the 2010 Act, Congress amended the very paragraphs that contain the five- and ten-year mandatory minimums to increase the fines applicable to those offenses, without altering the core relationship between punishment and quantity established in the 1986 Act.  See id. § 4.

Moreover, in the 2010 Act, Congress addressed a defendant's role as a sentencing factor courts should consider in addition to - not in place of - the quantity of narcotics involved in an offense.  As set forth in Section 6 of the 2010 Act, Congress mandated that the Commission, pursuant to its authority under Title 28, United States Code, § 994, amend the Guidelines to increase the punishment relating to the "Defendant's Role and Certain Aggravating Factors."  See Pub L. No. 111-220, § 6.  Congress instructed the Commission to "ensure an additional increase of at least 2 offense levels if," among other things, the defendant was an organizer, leader, manager or supervisor of drug trafficking activity and one or more "super-aggravating factors" were present.  See Pub L. No. 111-220, § 6; see also U.S.S.G. Manual, App. C., Vol. III., Amend. 748 (implementing Congress's amendments to the Guidelines in U.S.S.G. §§ 2D1.1(a)(11), 2D1.1(a)(12) and 2D1.1(a)(14)). Congress also instructed the Commission to amend the Guidelines to consider "Defendant's Role and Certain Mitigating Factors" by amending the "mitigating role cap" set forth in § 2D1.1(a)(5), and by providing for an "additional reduction of 2 offense levels" for defendants who receive a minimal role adjustment, have little knowledge of the illegal enterprise, received no compensation for the illegal transaction, and were "motivated by an intimate or familial relationship or by threats or fear where the defendant was otherwise unlikely to commit such an offense." Pub L. No. 111-220, § 7; see also U.S.S.G. Manual, App. C., Vol. III. Amend 748 (implementing Congress's amendments to the Guidelines in § 2D1.1(a)(5), 2D1.1(a)(15)).

        In the 2010 Act, Congress also created an exception to
the incremental relationship between punishment and drug quantity
for a limited class of defendants.  In Section 7 of the 2010 Act,
Congress instructed the Commission to amend the Guidelines "to
ensure that . . . if the defendant is subject to a minimal role
adjustment under the guidelines, the base offense level for the
defendant based solely on drug quantity shall not exceed level
32."  Pub L. No. 111-220, §7(1).  This exception implicitly
reaffirms the application of the incremental relationship between
drug quantity and punishment for all offenders who do not fall
within its ambit.  The 2010 Act makes clear that Congress
continues to believe that punishment should be linked to drug
quantity and that the incremental approach in the statutes and
the Guidelines are generally consistent with the purposes of
§ 3553(a).[5]

        In this case, the defendant's base offense level was
calculated based on the drug type and weight.  The defendant was
fully aware of both the quantity and type of drugs being sold
because he was directly involved in the negotiations of the
transactions with his heroin and cocaine suppliers and the CW.
Moreover, Congress has made clear that the individual punishment
should be linked to drug weight, and the Guidelines are
consistent with that statutory purpose.  As a result, a sentence
within the applicable Guidelines range is warranted.

        2.    The Guidelines Provide "Heartland" Sentences

        The Sentencing Commission's statistics since Booker
make clear that the Guidelines generally provide "heartland"
sentences in narcotics trafficking cases.  See U.S.S.G. Ch. 1 Pt.
A4(b) (defining "heartland" as "a set of typical cases embodying
the conduct that each Guideline describes").  The Commission's
2006 Report on the Impact of United States v. Booker on Federal

---

        [5]  Indeed, Congress's original delegation of authority to
the Commission in 1984 – before the mandatory minimums were
enacted in 1986 – instructed the Commission to "assure that the
guidelines specify a sentence to a substantial term of
imprisonment for categories of defendants in which the defendant
. . . committed a felony that is set forth in section 401 or 1010
of the Comprehensive Drug Abuse Prevention and Control Act of
1970 (21 U.S.C. §§ 841 and 960) [the predecessor to the 1986
Act], and that involved trafficking in a substantial quantity of
a controlled substance."  28 U.S.C. § 994(i)(5).  Congress's
delegation of authority made no mention of role.

13

Sentencing ("Booker Report") shows that, in the year following
the Supreme Court's decision in Booker on January 12, 2005,
district courts imposed sentences within or above the applicable
§§ 2D1.1 and 2D1.2 Guidelines range, or in accordance with
Government-sponsored departures under §§ 5K1.1 and 5K3.1, in
88.6% of powder cocaine cases, 78.7% of heroin cases, and 84.8%
of crack cocaine cases.[6]   See Booker Report at 128 & Table 20.
In the year after Booker, district courts imposed
below-Guidelines sentences (including both traditional downward
departures and those based on Booker) in 10.8% of powder cocaine
cases, 20.5% of heroin cases, and 14.7% of crack cocaine cases
under §§ 2D1.1 and 2D1.2.   See id.

        These statistics were consistent with the imposition of
Guidelines sentences in all other offense types during the
relevant time period.  Nationwide, across all offenses, "the rate
of sentencing in conformance with the sentencing guidelines [or
with government-sponsored downward departures] is 85.9%."   Id. at
46.  In the year after Booker, in other words, district courts
imposed Guidelines sentences in powder cocaine cases slightly
more often than they did across all offenses (88.6% v. 85.9%),
somewhat less often in heroin cases (78.7% v. 85.9%), and about
as often in crack cocaine cases (84.8% v. 85.9%).  The rate of
"below range" sentences for all offenses during the relevant time
period was 12.5%.   See id. at 47.  Here, again, district courts
imposed below range sentences slightly less often in powder
cocaine cases (10.8% v. 12.5%), somewhat more often in heroin
cases (20.5% v. 12.5%), and slightly more often in crack cases
(14.7% v. 12.5%).

        This trend continues to hold true.   See generally U.S.
Sentencing Commission 2011 Sourcebook of Federal Sentencing
Statistics ("2011 Sourcebook"); U.S. Sentencing Commission 2011
Annual Report ("2011 Report").  The Sentencing Commission's 2011
statistics indicate that courts imposed sentences within or above
the Guidelines range, or in accordance with a
government-sponsored downward departures, in 81.2% of narcotics
cases sentenced under § 2D1.1 (19,681/24,215), as compared to
82.5% of all cases (69,982/84,744).  Compare 2011 Sourcebook
Table 28 ("Sentences Relative to the Guideline Range by Each
Primary Sentencing Guideline"), with 2011 Sourcebook Table 27

---

        [6] The Booker Report also indicates that courts imposed
upward departures in 0.6% of powder cocaine cases, 0.8% of heroin
cases, and 0.6% of crack cocaine cases.  See Booker Report at 128
& Table 20.

14

("Sentences Relative to the Guideline Range by Each Primary Offense Category").[7]  Conversely, courts imposed below-Guidelines sentences in 18.7% of cases sentenced under § 2D1.1, as compared to 17.4% of all cases.  Compare 2011 Sourcebook Table 28, with 2011 Sourcebook Table 27.  The term "heartland" may escape easy quantification, but these percentages strongly suggest that district courts across the country have generally found that Guidelines sentences under § 2D1.1 serve the purposes of § 3553(a).

The distribution of these sentences is also consistent with the distribution of sentences for other offenses. Respectively, the statistics suggest that it is not true that "[a]ggravating circumstances occur just as frequently as mitigating ones" for any offense type, see Diaz at 20-21.  In fact, there is an inverse relationship across nearly all offense types between the length of a sentence and the frequency with which the sentence is imposed – that is, the higher the sentence, the fewer times it is imposed.[8]  Across all offenses, district courts impose below-Guidelines sentences in 17.4% of cases and above-Guidelines sentences in 1.8% of cases.  See 2011 Sourcebook at 50 (Table N).  This distribution is a fact of sentencing regardless of the offense type, and it is neither unique nor uniquely problematic in the drug trafficking context.

_____

[7]     Although narcotics trafficking cases sentenced under § 2D1.1 accounted for a disproportionately high 31.2% (24,215/77,406) of all federal cases during Fiscal Year 2010, their overrepresentation does not significantly alter the analysis.  See 2011 Sourcebook Table 8.  If § 2D1.1 cases are removed from the analysis, courts imposed sentences within or above the Guidelines, or in accordance with a government-sponsored downward departure, in 82.2% (43,502/52,891) of cases sentenced under all Guidelines provisions other than § 2D1.1. See id.

[8]     This proposition finds ample support in the Commission's 2011 statistics, which show that across all offense categories, 50.7% of within-guidelines-range sentences were at the "Guidelines minimum," 19.3% were in the "Lower Half of Range," 10.2% were at the "Midpoint of Range," 9.1% were in the "Upper Half of Range," and 10.7% were at the "Guidelines Maximum."  See 2011 Report at Table 29.  This distribution – with the largest number of sentences at the guideline minimum and a significantly lower number of sentences at the high end of the range-holds for 31 of 32 offense categories.  See 2011 Sourcebook Table 29.

15

Nor do the statistics show that courts depart further downward in drug trafficking cases. See Diaz at 22.  The Commission's 2011 Sourcebook shows that in drug trafficking cases in which courts imposed non-government-sponsored below-range sentences, the sentences were on average 37.3% below the Guidelines minimum.  See 2011 Sourcebook at Table 31; see also Diaz at 22 (noting that below-range crack cocaine, powder cocaine, and heroin sentences were, on average, 32.7%, 33.7% and 37.2%, respectively, below the bottom of the guideline range); see also 2011 Sourcebook at 89 & Table 31 (indicating that in "Drugs – Trafficking" cases, courts that issued below-guidelines sentences went on average 37.3% below the bottom of the guideline range).  Out of the 32 offense types listed by the Commission, below-range drug trafficking sentences were on average greater as a percentage of the bottom of the Guidelines range than all but three other offense types – murder, arson and robbery.  For example, district courts on average went 38.8% below the bottom of the Guidelines range in firearm cases, 42.7% below the bottom of the range in kidnaping cases, 54% below the bottom of the range in assault cases, 59.9% below the bottom of the range in money laundering cases, and 60.9% below the bottom of the range in fraud cases.  See 2011 Sourcebook Table 31.  In fact, across all offense types, courts that issued below-range sentences on average went 44.9% below the bottom of the Guidelines range.  See id.  Accordingly, the extent to which judges depart below the Guidelines in narcotics cases is not indicative of a particular disagreement with the Guidelines for narcotics trafficking offenses.

Accordingly, in this case, a sentence within the Guidelines range is commensurate with the seriousness of the offense.  Moreover, a Guidelines sentence is one that will promote general respect for the law and is justified to afford adequate deterrence to criminal conduct from those individuals involved in narcotics trafficking.

16

IV.   <u>Conclusion</u>

          For the foregoing reasons, the defendant should be
sentenced to a term of incarceration within the advisory
Guidelines range of 70 to 87 months.

                              Respectfully submitted,

                              LORETTA E. LYNCH
                              United States Attorney


                    By:   _____/s/_____
                              Brendan G. King
                              Assistant U.S. Attorney
                              (718) 254-6006


cc:  Joyce C. London, Esq.
     Roberta Houlton, U.S. Probation